## THE PRESIDENT *Ex Rel.* THE QUEEN'S HOSPITAL *vs.* J. B. CASTLE, Collector-General of Customs.

ON APPEAL FROM FIRST JUDGE, FIRST CIRCUIT COURT, DENYING A WRIT OF MANDAMUS.

HEARING, SEPTEMBER 28, 1894. DECISION, OCTOBER 19, 1894.

JUDD, C.J., BICKERTON AND FREAR, JJ.

(1) An Act of the Legislature of 1890 imposing a port charge upon all ships bringing passengers from any foreign port to any of the ports of these islands, of one dollar for each passenger for the benefit of the Queen's Hospital, is plain and not doubtful.

(2) A practice by the Executive under a previous Act taxing passengers two dollars each—by which passengers who were brought in by the Board of Immigration under contracts to labor were exempted from this tax—is not a "construction" of the Act of 1890 which should weigh with the court.

(3) The duty of collecting this tax is ministerial, involving no exercise of judgment or discretion. Mandamus is therefore a proper remedy, to require the official charged with the duty to execute it.

(4) The right to sue upon the official bond of the officer is not an adequate remedy and does not supersede the right to mandamus.

(5) A statute prescribing that the written construction of a doubtful revenue law by the Minister of Finance shall be binding and conclusive upon the customs officials, does not deprive a person claiming to be injured by such construction of his right of redress in the courts.

### OPINION OF THE COURT, BY JUDD, C.J.

: The substantial facts of this case are as follows: The steamer "Miike Maru" brought to this port from Japan on the 26th June last some 1200 Japanese engaged with the Board of Immigration under contracts to labor in these islands. The trustees of the Queen's Hospital claimed that under the statutes in force, the Collector General should collect of the steamer the sum of one dollar for each such passenger for the benefit of the hospital. The Collector General under written instructions from the Minister of Finance allowed the steamer to be cleared from this port without collecting this charge. It appears by affidavit that in 1879, a tax of two dollars each was collected of immigrants arriving here per "Ravenscraig" from islands belonging to Portugal. This was under the statute as it then stood and it was only in this instance that the tax was collected of passengers of this character. It also appears that in 1886, the government informed the trustees of the Queen's Hospital that the tax would thenceforth be not collected. A writ of mandamus was issued to compel the collection of this charge, while the steamer was still in port, and after hearing, the peremptory writ was denied.

A sketch of the enactments on the subject of the "passenger tax" in aid of the Queen's Hospital becomes necessary here. On the 15th May, 1859, a general act was passed to "aid in the establishment of hospitals for the benefit of sick and disabled Hawaiian seamen," by which a tax of two dollars was levied upon every passenger arriving from a foreign port at any of the ports of these islands. This was payable to the several collectors of customs, for the

support of hospitals for the benefit of sick and disabled Hawaiian seamen. This tax was to be reported to the Minister of Finance who was to hold the same subject to the disposition of the Minister of the Interior, according to the requirements of the Civil Code in regard to the hospital tax on Hawaiian seamen. By the Civil Code, Sec. 161, all seamen on vessels under the Hawaiian flag, whether engaged in foreign or domestic trade, had to have deducted from their wages twenty-five cents a month. This was to be paid into the treasury to be held as a "Marine Hospital Fund" for the relief of sick and disabled Hawaiian seamen and to be disbursed by the minister for the relief and accommodation of such seamen until hospitals should be established for that purpose. There were other provisions establishing a fund from the unexpended surplus of this tax for a marine hospital. On the 20th April, 1859, an act was passed authorizing the Minister of Interior to grant a perpetual charter to persons applying therefor for the establishment of a hospital in Honolulu for the relief of sick and destitute Hawaiians. The Queen's Hospital was then incorporated by charter of the Minister of the Interior, authorized by a resolution of the King and Privy Council of the 16th June, 1859. We understand that the revenue obtained from both these sources (from seamen's wages and passenger tax) was paid over to the trustees of the Queen's Hospital, in accordance with biennial appropriations made by the legislature. Every appropriation bill from 1862 down to 1882, contains items appropriating moneys to "Hospital Fund (estimated receipts)." The amounts vary from $2400 in 1862 to $17,000, which was the amount appropriated in 1882. The Minister of Finance's report shows $22,681.89 collected for that period, ending March 31st, 1882. From 1882 to 1886, the item in the appropriation bill reads "Hospital Fund (estimated receipts) all receipts to be paid over to the Queen's Hospital," $15,000, or whatever sum was appropriated. At this session of the legislature, 1882, it was enacted that $2500 of the hospital tax levied upon passengers should be annually reserved by

the trustees of the Queen's Hospital and distributed by the trustees to various charitable and benevolent societies in Honolulu. No amount is appropriated in 1888, but it was enacted by Section 8 of the appropriation bill that "the hospital tax fund shall from time to time be paid over to the treasurer of the Queen's Hospital."

In 1890, the system was changed, and the tax of two dollars to be paid by each passenger entering these islands from abroad was abolished and a port charge was established, subjecting every vessel arriving from a foreign port at any of the ports of these islands with passengers on board to a tax of one dollar for each passenger. The new law enacted that this tax "should form a part of the port charges and shall be paid to the collector of the port, and no collector. shall grant a clearance to any such vessel until the same be paid." This legislation was accomplished by an amendment of the Act of May 13th, 1859, and the proceeds were to be devoted to the same purposes as when the tax was paid by the passenger.

There being some doubt whether this tax should be paid directly to the Queen's Hospital, the legislature of 1892 (Chap. 40 of the laws of the year) enacted that "all moneys heretofore collected and now unexpended, and all moneys which may hereafter be collected under any existing or future. statute authorizing the collection of any hospital tax, shall be paid into the public treasury and held by the Minister of Finance, as a special deposit to the credit and for the benefit of the trustees of the Queen's Hospital. Such special deposit shall at all times be subject to the order of said trustees, or such officer thereof as may be by them authorized, and shall be by such trustees devoted to the purpose of said Queen's Hospital." With this law in view, showing that the legislature considered the Minister of Finance as the mere agent by which this fund should be collected, the legislature did not appropriate the hospital tax. It did not consider it as public revenue subject to distribution by the legislature. In addition to this special tax the legislature has, without

interruption from 1862 to 1892, appropriated biennially various sums as "Aid to the Queen's Hospital." This, we believe, is all the legislation on the subject. To summarize it : From 1862 to 1890 a tax of two dollars was levied upon all passengers for the benefit of the Queen's Hospital. Since 1890 a port charge of one dollar for each passenger brought is levied upon all ships bringing passengers here for the same object. It is urged upon us that since the government has uniformly, with but one exception (in 1879), not collected this "passenger tax" whether imposed upon the passenger or the ship, in case the passengers were immigrants or laborers coming hither under contracts with the Board of Immigration, it has thus put a "construction" upon the law, holding that "passengers" who are contract laborers are not "passengers" wit' in the meaning of this tax law. We admit the principle laid down in *Telephone Co. vs. Telephone Co.*, 5 Haw., 460, that "the contemporaneous and uniform interpretation of an act of the legislature by an executive department is entitled to great weight and in a case of doubt ought to turn the scale." But the government had nothing in this statute to construe. There was nothing doubtful in the law. The government simply decided that they would exempt this class of passengers from this tax. The motive for so doing was, as stated to us in argument, the unwillingness on the part of the government to add to the planters and others employing these laborers the burden of paying two dollars apiece which might or might not be chargeable to the laborers, according to the contract between them and their employers. As we have seen, the situation is now materially changed. The passenger does not now pay the tax. So the argument as to lightening the expenses of the employer of labor fails. The reasons for the former exemption do not now exist. Then, too, the tax does not now go into the public treasury as a general realization, to be appropriated to the hospital by a vote of the legislature. It is now, when collected, a special deposit and not subject to legislative distribution so long as

the Act of 1892 is unrepealed. The government is a mere depository of the fund as the law now stands. By the statute there is no discretion vested in the government either as to the collection of the tax or its distribution.

The duty asked by the petitioners to be done by the Collector General is a ministerial duty. Mandamus is therefore the proper remedy. Chapter 39 of the Acts of 1876, Sec. 5, authorizes the writ to be directed to public officers to compel them to fulfill any of the duties attached to their offices, or which may be legally required of them. In *Castle vs. Kapena,* 5 Haw., 27, it was held that mandamus lies against a cabinet minister to compel the performance of purely ministerial duties. This leads us to the defense made by the Collector General that he may not be compelled to exact this tax because he was instructed in writing by the Minister of Finance not to collect it. The statute relied upon in Sec. 525 of the Civil Code (Comp. Laws, pp. 149 and 150). "In relation to the collection of duties, and in all other matters relative to the execution of the revenue laws, the collectors, and other officers of the customs, shall obey the written instructions of the Minister of Finance; and in case any difficulty shall arise as to the true construction, or meaning of any part of such revenue laws, the written decision of the Minister of Finance shall be conclusive and binding upon such collectors, and other officers of the customs." We do not understand that it is claimed that a construction of a revenue law made by a Minister of Finance is final and conclusive on *all persons.* This would in effect create a legal tribunal higher than this Court. The statute merely makes such construction binding upon the minister's subordinate officers. It cannot be contended for one moment that this law deprives persons, who conceive that their rights are injuriously affected by a construction put upon it by the minister from seeking redress in the courts. To concede this would be to sanction an usurpation of judicial authority. The effect of this statute is that such rulings of the minister must be followed by the subordinate so long as

they are unreversed by the court or the legislature. This secures uniformity of practice and prompt action. The statute may also exempt the collector who obeys the minister's instructions from personal liability in a suit for damages—though this question is not at issue here. The legislature has not in this instance transferred the law-making power to the minister. If it had, such a statute would be unconstitutional, being in violation of Art. 20 of the Constitution of the Republic, which requires the Executive, Legislative and Judicial powers of the Republic to be preserved distinct.

The statute of 1890, imposing this tax or port charge, clearly and distinctly fixes a peremptory or mandatory duty upon the Collector General, not involving any degree of judgment or discretion on his part. This being the case mandamus will lie. High on Extraordinary Remedies, Secs, 24 and 34, and cases there cited.

The Japanese who came here on the steamer in question were "passengers." The statute of 1890 does not exempt the ship from the tax when its passengers are "immigrants" or "contract laborers to the Board of Immigration," or any class, quality or race of passengers. We find the statute to be plain and not doubtful in any of its terms. The Legislature of 1890 could well have exempted ships carrying the class of passengers under discussion from this tax, but they have not done so, and the Minister of Finance cannot supply by construction what the legislature omitted.

We do not consider that the clause in the contracts with Japanese brought here by the Board of Immigration that these persons shall have "free passage" bears upon the question whether the ship bringing them shall pay the port charge for the benefit of the Queen's Hospital. The law does not impose the tax upon the passengers themselves, and it is too violent an assumption that if the ship paid it the ship would make the passengers pay it back.

It was suggested that the Queen's Hospital has a remedy by suit on the respondent's bond as Collector General, and

that therefore this writ should not issue. Sec. 2 of the Act of 1876 defining the writ of mandamus, is as follows: "The object of this order is to prevent a denial of justice, and it therefore issues in all cases where the law has assigned no specific relief by the ordinary means of relief, if the slowness of ordinary legal forms is likely to produce such a delay, that the public good and the administration of justice will suffer from it, and where justice and reason require that some mode should exist of redressing a wrong, or an abuse of any nature whatever."

The conditions of this case are within this section. The remedy by suit on the bond would be slow and uncertain, considering the fact that the respondent acted under instructions from his superior.

It is held in *State vs. Dougherty*, 45 Mo., 294, that a remedy by suit on an official bond for non performance of official duty is inadequate.

High, Ex. Rem., Secs. 35 and 139.

See *In re Richardson*, 6 Haw., 216.

*Aikoe vs. Hayselden*, Id., 534.

In *Kendall vs. United States*, 12 Peters, 615, the court held that an action against the postmaster general for damages would not be an adequate remedy for his neglect of his official duty in withholding certain credits from a contractor for carrying the mail, and say: "If the denial of the right be considered as a continuing injury, to be redressed by a series of successive actions, as long as the right is denied, it would avail nothing and never furnish a complete remedy. * * * It would be a remedy in name only and not in substance; especially where the amount of damages is beyond the capacity of the party to pay."

We therefore hold that the respondent has not shown sufficient reasons to justify his not collecting the tax and a peremptory mandate to collect it may issue.

When this case was argued before us the steamer in question had left the port without paying the tax, and it was agreed between the Attorney-General and counsel for the

petitioner that this fact should not affect the determination of this case, they desiring a decision upon the law involved.

*Carter & Carter*, for petitioner.

*Attorney-General W. O. Smith* and his Deputy, *A. G. M. Robertson*, for respondent.