JOHN LUCAS *v.* THE AMERICAN-HAWAIIAN ENGI-
NEERING AND CONSTRUCTION COMPANY,
LIMITED, C. S. HOLLOWAY, Superintendent of Pub-
lic Works of the Territory of Hawaii, and J. H. FISHER,
Auditor of the Territory of Hawaii.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED JULY 14, 1904.            DECIDED AUGUST 5, 1904.

FREAR, C.J., HARTWELL AND HATCH, JJ.

INJUNCTION AGAINST PUBLIC OFFICER—*scandal and impertinence in
answer.*

Allegations in an answer setting up that the bill was brought to
gratify private vengeance and not in the public interest, and that
plaintiff had threatened the institution of this suit unless certain
officers of defendant corporation should use their influence to cause
the dismissal of another suit pending against the plaintiff, no unfair
advantage having been shown to have been gained in consequence
of the same, held properly stricken out on exceptions to answer.

ID—ID—*motives.*

The motives of a taxpayer in brnging such a suit held not to be
the subject of inqury.

ID—*taxpayer, right to sue.*

A tax payer may maintain a bill for an injunction against a
public officer to restrain him from carrying out an illegal contract.

ID—*laches.*

A delay of two months after the award of a contract before
bringing suit held not laches.

ID—*uncertainty in specifications.*

A contract for the construction of a wharf and other work, based
on specifications which reserved to the Superintendent of Public
Works the right to use in the new work any piles from the old

work considered suitable, held to constitute such an element of uncertainty as to render intelligent bidding and competition impossible, and the contract itself void.

OPINION OF THE COURT BY HATCH, J.

This is an appeal in equity from the First Circuit. The decree appealed from perpetually enjoins and restrains the defendant, the American-Hawaiian Engineering and Construction Company, Limited, from receiving any money under a contract for the construction of certain public work made between it, said defendant, and the defendant C. S. Holloway, Superintendent of Public Works of the Territory of Hawaii, as alleged in the bill; and enjoins said Superintendent of Public Works from signing or approving any vouchers for work done or materials furnished under said contract; and enjoins said defendant J. H. Fisher, Auditor of the Territory from issuing warrants or payments for work or labor done, or materials furnished under said contract. The contract was made on the 5th of March, 1904. It is therein provided that the American-Hawaiian Engineering and Construction Company, Limited, should "furnish all labor, material and removing existing structure and construct Brewer's Wharf and Shed, using new piles throughout the wharf and laying 1½" Bitumen in 4" of Concrete Foundation in accordance with plans No. 1290 on file in the Superintendent of Public Works office and specifications hereto annexed and forming a part hereof, and to complete the same on or before the 10th day of August, 1904," and the said defendant C. S. Holloway, as such Superintendent of Public Works, therein and thereby agreed to pay to the said defendant, American-Hawaiian Engineering and Construction Company, Limited, 'the sum of Thirty Eight Thousand Seven Hundred (38700.00) (for Wharf and Shed and 28c. per sq. ft. for Bitumen and Concrete Foundation) Dollars in lawful money; payments to be made as follows: 75% of value of material used and work done each month and the balance when the whole work shall have been completed in accordance with the provisions of

this agreement, and shall have been accepted by the Superintendent of Public Works."

This contract was awarded in pursuance of a call for tenders made by the defendant C. S. Holloway, Superintendent of Public Works, on the 20th day of January, 1904, which was duly published in certain newspapers in Honolulu and is in the words and figures following, to wit:

"SEALED TENDERS.

"Sealed Tenders will be received until 12 M., of Saturday, February 20th, 1904, by the Superintendent of Public Works for furnishing all materials and remove existing structure and construct Brewer's Wharf and Shed.

"Plans and Specifications on file in the office of Engineer Department of Public Works. The Superintendent reserves the right to reject any and all bids. Proposals to be endorsed on envelope

" 'Proposal for Constructing Brewer's Wharf and Shed.'

"C. S. Holloway,

"Superintendent of Public Works.

"January 20, 1904."

The specifications referred to in the notice published, among other things, contained the following provisions:—

"WORK:

"The work to be done under these specifications consists in furnishing all material and labor. To remove existing structures and construct wharf and shed.

"REMOVAL OF OLD STRUCTURE:

"The contractor must remove old shed and wharf. The material to be the property of the contractor, except piles, mooring rings, cannon and mooring bits.

"The old material must be removed from the locality of the work as fast as it is removed, the locality of the work will not be permitted to be littered with the old material.

"The piles shall be carefully pulled and scraped clean of any marine growth and piled on bulkhead at end of slip between Brewer's and Nuuanu Wharves.

"The Department reserves the right to use, in the new structure, any of the old piles that may be suitable. The contractor must patch the coppering where necessary and extend same, if necessary. In pulling piles, care must be taken not to damage

copper. Any damage must be repaired by the contractor. Piles must be delivered to the Department of Public Works in good condition. * * *

"ALTERNATE BITUMEN PROPOSITION:

"The entire area of wharf and space under shed to be bitumenized with 2″ of bitumen on top of wharf sheeting and concrete foundation as hereinbefore specified. On top of the sheeting shall be laid ½″ x 2″ strips spaced 2 feet apart. The bitumen used on surface of wharf must be hard bitumen disintegrated in closed kettles. The bitumen must be laid true to line and grade, and places that hold water must be removed and properly constructed. The surface of bitumen on wharf to be well brushed with cement grout."

Subsequently, on the 2nd day of February, 1904, said defendant, Holloway, as such Superintendent of Public Works, caused to be sent to certain prospective bidders for the work described in said advertisements, written notice in the words and figures following, to wit:

"Referring to the tenders for the construction of the Brewer's wharf and shed, would ask that you put in a bid for the bitumen floor as an extra, rather than making a total figure for the wharf and bitumen.

"Yours truly,
"J. H. Howland,
"Asst. Supt. of Public Works."

And on the 16th day of February, 1904, he caused a written notice to be mailed to certain prospective bidders for said work, which notice is substantially in the words and figures, following, to wit:

"Honolulu, T. of H., February 16, 1904.

"Messrs. .........................:

"Inasmuch as the specifications for Brewer's wharf are rather indefinite as regards the number of piles which will be available from the old structure, would ask that you will figure on new piles, stating allowance per pile for those furnished by the Government. By adding this item to the specifications each bidder will be able to figure exactly the same amount of work.

"Very truly yours,
"J. H. Howland,
"Asst. Supt. of Public Works."

The bid of the American-Hawaiian Engineering and Construction Company was as follows:

"American-Hawaiian Engineering and Construction Company,
                    "Limited.
            "508-509-510 Stangenwald Building,
                    "Honolulu, T. H., February 20, 1904.
"C. S. Holloway, Esq.,
        "Supt. of Public Works.
"Dear Sir:—

"We herewith propose to furnish all material and perform all the work for the construction of Brewer's Wharf and Shed, in accordance with the plans and specifications, for the sum of Thirty Eight Thousand Seven Hundred Dollars ($38,700.).

"We will lay the bitumen floor for the following sum additional:

"For 2" bitumen covering only, per sq. ft. . . . . . . . . . . . . . .$ .17
"For 2" bitumen covering with 4" concrete foundation
    (including grading and rolling) per sq. ft. . . . . . . . . . .  .30
"For 1½" bitumen covering with 4" concrete foundation
    (including grading and rolling) per sq. ft. . . . . . . . . . .  .28

"We herewith enclose certified check for Two Thousand Dollars ($2,000.) to your order.
            "Yours truly,
                    "American-Hawaiian Eng. & Con. Co., Ltd.
                        "Chas. H. Gilman,
                            "President."

On the 20th of February, 1904, at 12 noon, pursuant to the said advertisement, the said defendant, Holloway, as such Superintendent of Public Works, proceeded to open the sealed proposals received by him for doing said work and awarded the contract to said defendant, the American-Hawaiian Engineering and Construction Company.

On the 3rd day of May, 1904, the plaintiff, a citizen and taxpayer of the Territory brought this suit for an injunction against the defendants as above stated.

The plaintiff excepted to certain paragraphs of the answer of the American-Hawaiian Engineering and Construction Company on the ground of scandal and impertinence. The exception was allowed and the paragraphs complained of stricken out.

The portion of the answers stricken out averred that the suit was brought, and the process of the court used, for the purpose of gratifying private vengeance, and not to vindicate public interest; and that plaintiff had threatened to make trouble for defendant unless it used its influence to procure the dismissal of a suit brought by one Kendall against the plaintiff and the Superintendent of Public Works to restrain the execution of a contract made between them, and that petitioner threatened the president of the American-Hawaiian Engineering and Construction Company, Limited, with the institution of this suit unless he used his influence and caused the said Kendall suit to be dismissed. It is urged that the trial judge erred in allowing the exception to the answer. It was conceded by defendant on the argument that the weight of authority is that the motives of a taxpayer in bringing a suit can not be inquired into if he has shown that he has the other qualifications to sue. But it is contended that the offer was to show something more than motives; that the answer set up such acts on the part of the plaintiff as should deprive him of the right to sue in a court of equity. Equity will give no relief to a party who does not come into court with clean hands. In order to apply the rule, however, some fraudulent or dishonest practice must be shown; some attempted abuse of process; or some conduct evidently contrary to equity and good conscience. The acts set up in the portion of the answer excepted to hardly come within this category. It was not contended by the answer that in consequence of the alleged threats the plaintiff had gained any advantage over the defendants, or either of them, or that the situation or rights of the parties had been affected thereby. The threats used amounted, at most, to a threat to bring a suit which plaintiff was entitled to bring. Though the alleged conduct of plaintiff, if proved, would be open to criticism, we do not think the matters set up should deprive the plaintiff of the right to sue. Moreover, the plaintiff is suing in a representative capacity. As a taxpayer he is appearing on behalf of himself and of all other taxpayers; that is, on behalf of the public. He is volunteering

to act as a trustee on behalf of the public as far as this suit is concerned. There are numberless other available plaintiffs. His standing as a trustee, and his motives, are not matters of the first importance. What the court is chiefly concerned with under the pleadings, is the rights of the public in respect to the contract called in question, and whether there has been any breach of duty in awarding the same. That motives can not be inquired into is well settled. *Mazet v. Pittsburgh,* 137 Pa. St. 554; *Times Publishing Co. v. Everett,* 9 Wash. 519; *Brockman v. Vreston,* 79 Iowa 592. On the showing made we sustain the ruling allowing the exceptions to the answer.

It is next contended that the plaintiff has no right as a taxpayer to maintain this suit. The right of a taxpayer to bring suit to restrain a public officer from doing an ilelgal act has been settled in this jurisdiction since the case of *Castle et al. v. Kapena,* 5 Haw. 27 (1883). If the question could be considered an open one we should follow the rule laid down in *Crampton v. Zabriske,* 101 U. S. 601, and in *R. P. R. R. Co. v. Hall,* 91 U. S. 343, cited in *Castle. v. Kapena.* It is not necessary that the plaintiff should show actual damage to himself and to all others similarly situated, as is contended by the Assistant Attorney General. The cause of action is the alleged improper awarding of a contract, after a call for tenders based on indefinite specifications. If there has been a violation or evasion of the law requiring the awarding of the contract to the lowest bidder, after a public advertisement for tenders, damage is presumed to result to all taxpayers. The object of the suit is to prevent the violation of the law. The consequences which may result in case the law is disregarded are so obvious that no proof of actual pecuniary damage is necessary. In *Crampton v. Zabriske* the court on page 609 says: "* * * From the nature of the powers exercised by municipal corporations, the great danger of their abuse, and the necessity of prompt action to prevent irremediable injuries, it would seem eminently proper for courts of equity to interfere upon the application of the taxpayers of a county to prevent the consummation of a wrong,

when the officers of the corporations assume, in excess of their powers, to create burdens upon property-holders. Certainly in the absence of legislation restricting the right to interfere in such cases to public officers of the state or county, there would seem to be no substantial reason why a bill by or on behalf of individual taxpayers should not be entertained to prevent the misuse of corporate power." The plaintiff comes within the rule, and no further showing as to damages is necessary under the facts in this case.

The defendants next contend that the delay of the plaintiff in bringing these proceedings constitute laches. The contract was awarded on the 5th of March, 1904. Suit was brought on the 3rd day of May following. The contract was to be completed within five months from the date of the contract. Mere delay, short of the period of the statute of limitations, will not suffice to constitute laches if the parties have not changed their relative positions. *Daggers v. Van Dyck,* 37 N. J. Eq. 130. An important element in the matter of laches is the fact whether or not a defendant has been lulled into security by the inaction of the plaintiff and has done acts in respect to his property which he otherwise would not have done. *Gibbons v. Hoag,* 95 Ill. 45. The circumstances must have been such that it would be inequitable in consequence of change of conditions to permit plaintiff to assert his rights. *Calliher v. Cadwell,* 145 U. S. 368. The length of time which must elapse in order to show laches varies with the peculiar circumstances of each case and is not subject to any arbitrary rule. *Halstead v. Grinnan,* 152 U. S. 412.

We do not think that the delay in this case was sufficient to establish laches. It can hardly be said that facts existing on the date the suit was brought differed so much from those that existed from the time of awarding the contract that it would be inequitable to now consider on the merits the case made by the plaintiff. It is true the defendant The American-Hawaiian Engineering & Construction Company had ordered a large amount of material, most of which had arrived on the ground

before the suit was brought. This, however, must have been ordered very shortly after the awarding of the contract. It would be impossible to hold that the fact that materials had been ordered by a contractor who was acting under an invalid contract would prevent the court from inquiring into the validity of the contract without practically denying relief in all cases. And though under some circumstances the facts might warrant the court in holding the party estopped from bringing proceedings after only a short delay, still we do not think such a showing has been made in the present case.

The defense of laches was not set up in the answers and does not appear to have been urged before the trial judge. A very strong showing should be made in order to have the defense prevail in the appellate court for the first time. "The decision on the subject of laches is so much a question of discretion dependent upon the evidence that generally it will not be disturbed by an appellate court unless it is clearly against the evidence." *Muchison v. Payne,* 37 Tex. 305.

Whether or not the plaintiff has been guilty of laches in any particular case is a question very largely within the province of the trial court. *Merherin v. S. F. Produce Exchange,* 117 Cal. 159.

In view of the foregoing we hold that laches has not been established in the present case.

This brings us to a consideration of the merits. The first contention advanced by the plaintiff is that the original plans and specifications were too indefinite to be the basis for competitive bids. The uncertainty claimed arose from the right reserved by the department to use in the new structure any of the piles removed from the old structure. This right being reserved in the specifications was binding upon all intending bidders, and they were obliged to take it into consideration and make provision against its exercise. It is impossible, however, to see how any intending bidder could intelligently provide against the exercise of the right reserved. Instead of framing a bid for a definite quantity of material and definite work, the

bidder was faced by conditions purely speculative. The depart-
ment did not undertake to say for what per centage of the new
work old piles could be used. It did not commit itself to fur-
nish, or permit the use of, any old piles. Yet the menace was
always present that the most careful estimate of a bidder might
be upset by directions to take and use old piles. The Assistant
Superintendent of Public Works, Mr. Howland, testified that
at the time the original plans and specifications were filed it was
not known how many of the old piles, if any, would be available
for use in the new structure, and that it was not positively ascer-
tained that none were available until after they were pulled up
and placed on the bulkhead, which was after the contract had
been awarded. Bidders were thus left entirely in the dark as
to what the conditions actually would be when the work was
undertaken. The element of uncertainty was so great as to ren-
der definite and exact bidding impossible. This tended to pre-
vent competition and to defeat the law requiring the call for
tenders. It moreover opened the door to favoritism and fraud
by making it possible for the Superintendent of Public Works
to give definite assurances to a favored bidder as to the number
of old piles which would be permitted to be used in the work;
thus enabling him to under bid others who might consider it
unsafe to bid on any other basis than that of new piles for the
entire work, there being no certainty under the specifications
that any old ones could be used. Many obvious abuses might
follow such a course of conducting calls for bids, if it once
became established as a precedent. It would be likely to defeat
entirely the object of the law requiring the letting of public
contracts only after a call for tenders. The facts in the present
case do not warrant the slightest imputation against the Super-
intendent of Public Works. He acted in perfect good faith.
The uncertainty in the specifications arose from a desire to save
to the Territory the value of the old piles, if they had any, and
to reduce the cost of the work in hand. In fact the disadvan-
tage resulting from the uncertainty in the specifications occurred
to him. This was the occasion for the letter to intending bidders,

requesting them to figure on new piles and to state an allow-
ance per pile for those furnished by the government. No new
advertisement was made, however. Prospective bidders
remained in the dark as to whether the right reserved to require
the use of old piles would be exercised, and there was the addi-
tional uncertainty as to whether the letter was a legal modifica-
tion of the call for tenders. There was no uniformity of action
on the part of bidders, and none was to be expected under the
conditions as they then stood. Some bidders ignored the letter,
as they had the right to, treating it as no part of the legal call
for tenders. Others complied with the request. This shows
there was no real competition. Genuine competition can only
result when parties are bidding against each other for precisely
the same thing and on precisely the same footing. The fact that
the business is in such shape that divergent bids might be made,
whether actually made or not, should be controlling in consider-
ing the validity of the transaction.

Section 10, Act 18, Laws of 1903 extra session, which the
court below found was the law under which the contract was let,
provides: "Every contract for constructing public works, or
for furnishing material therefor, amounting to Five Hundred
Dollars ($500.00) or more, shall be awarded to the lowest bid-
der who shall furnish a sufficient bond, only upon public adver-
tisement for tenders."

The object of all such statutory provisions is to prevent favor-
itism, corruption, extravagance and improvidence in the award-
ing of all public contracts. *People ex rel. Coughton v. Gleason,*
121 N. Y. 631.

A fair competition among the bidders is the prime object of
such statutory provisions, and anything which tends to impair
this is illegal. *Mazet v. Pittsburgh,* 137 Pa. St. 548. Such a
provision requires such information to be put within the reach
of bidders as will enable them to bid intelligently and will enable
the official having charge of the proposed work to know whose
bid is the lowest. The character of the work and the materials
of which it shall be composed must be decided in advance.

*Coggeshall v. Des Moines,* 78 Iowa 235; *Kneeland v. Furlong,* 20 Wis. 460; *Boren v. Com's. of Drake Co.,* 21 Ohio St. 311; *Detroit v. Circuit Judge,* 79 Mich. 384.

In *California Improvement Co. v. Reynolds,* 55 Pac. R. 802, it was held that a contract for street paving at a certain price per square foot which reserved to the street superintendent the power to require a greater or less amount of certain material in the work, thereby affecting the profits on the work, is invalid, as discouraging competition in bidding. This case is very similar to the case at bar and illustrates clearly the vice of permitting any factor in the contract to be within the unqualified control of any official under whom the work is to be done. In the California case the specifications provided that "the rock to be used on the surface of the roadway shall be of such size as to pass through a one-inch mesh, a smaller percentage of fine material consequent upon the crushing of the rock being allowable, the amount of the same to be governed by the Superintendent of Streets." The court says: "Under this specification the superintendent was at liberty after the contract had been entered into to determine or vary the amount of fine material to be used, and it was therefore impossible for bidders to determine in advance the cost for doing the work, and competition in bidding was therefore restrained, and after the contract had been awarded the owners were unable to determine whether it would be to thir advantage to elect to take the contract."

Statutory provisions prescribing the mode and time of advertising for bids are mandatory, and must be strictly construed. *McCloud v. Columbus,* 54 Ohio St. 439.

The letters from the office of the Superintendent of Public Works, dated respectively Feb. 2nd, 1904, and Feb. 16, 1904, did not eliminate the uncertainty in the specifications. The specifications could not be legally amended without new advertisement, which was not had.

Holding as we do that the proceedings in regard to the placing of this contract were fatally defective and that a valid contract could not be based upon the faulty specifications for the reasons

.given, it becomes unnecessary to discuss the other propositions ·advanced by counsel for the complainant.

The decree appealed from is affirmed.

*Kinney, McClanahan & Cooper* for plaintiff.

*M. F. Prosser, Assistant Attorney General,* for defendants Holloway and Fisher.

*Castle & Withington* for defendant American-Hawaiian Engineering & Construction Co., Limited.