L. L. McCANDLESS *v.* GEORGE R. CARTER, GOVERNOR OF THE TERRITORY OF HAWAII AND JAMES W. PRATT, COMMISSIONER OF PUBLIC LANDS OF THE TERRITORY OF HAWAII.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED JANUARY 25, 1907.   DECIDED FEBRUARY 1, 1907.

FREAR, C.J., HARTWELL AND WILDER, JJ.

EQUITY PRACTICE—*injunctions, whether issued on averments upon information and belief—against public officers, right of citizen to obtain.*

Injunctions, as a general thing, ought not to be issued upon statements of material matters made upon information and belief.

An averment of the value and kind of lands being largely a matter of information and belief is sufficient.

BILL FOR INJUNCTION BY A CITIZEN AND TAXPAYER.

Whether a bill by a citizen and taxpayer to obtain an injunction to restrain public officials from unauthorized acts affecting public property exists in cases where there is no pecuniary loss to the plaintiff, quaere.

PUBLIC LANDS—*exchange for private lands—power of commissioner under Secs. 252 and 276, R. L., limitation of.*

The power of the commissioner of public lands in the matter of exchanging public for private lands is not found in Sec. 252, R. L., but in Sec. 276, R. L., and is not confined to lands not under lease or to parcels of not over 1000 acres.

EXERCISE OF DISCRETIONARY POWER BY PUBLIC OFFICIALS—*injunctions against.*

Injunctions are not issued to restrain public officials in the exercise of discretionary power.

OPINION OF THE COURT BY HARTWELL, J.

This was a bill to obtain an injunction restraining the governor and the commissioner of public lands from exchanging for private lands certain public lands on the Island of Lanai having an area of 47,669 acres of which all but 1000 acres are held by one Charles Gay under five leases terminating respectively February 9, 1907, of 7400 acres; November 1, 1907, of 7900 acres; June 23, 1908, of 9000 acres; January 1, 1916, including the lands of Kamoku, area 8291 acres and Poomai, area 9078 acres, and January 2, 1925, of 5000 acres, the total annual rentals being $1600.

The bill avers that the commissioner threatens to and will exchange said public lands for other lands equal in value and that the governor threatens to and will approve of the exchange unless restrained and enjoined from so doing; that the governor caused the following notice to be published in the daily newspapers: "Lanai Lands. Notice is hereby given that having decided an Exchange of the Public Lands on the Island of Lanai to be advisable, the Commissioner of Public Lands is prepared to receive offers of other lands that are equal in value to those

of Lanai, *and of greater immediate service* to the Territorial Government, from any responsible person, up to and including Saturday, the fifteenth day of December, 1906. G. R. Carter, Governor. Executive Building, Honolulu, November 28, 1906;" that the commissioner has no right or authority to exchange these lands for other lands of equal value or for any other lands and that the governor has no right or authority to approve of the exchange which is not by way of compromise or equitable settlements of rights of claimants, nor by way of exchange for parcels of land required for roads, nor for sites of government buildings, nor for any other government purposes; that the lands are of great value, the said land of Kamoku, containing about 8000 acres of good grazing land with about three miles of sea frontage with a good harbor, the land extending inland about six miles, having a value of $40,000; that the said land of Poomai is good grazing land having about five and one-half miles of sea frontage, including a fair harbor or landing, and extending inland over six miles, having a value of $37,000; that each of the other lands is worth more than $5,000.

The averments made upon information and belief are that the commissioner threatens to make the exchange mentioned and those which relate to the value and condition of the lands. The jurat is in the usual form—that the plaintiff has read the complaint and knows its contents and that "the same are true, except as to those matters therein stated on information and belief, and as to those he believes it to be true." Ex parte injunctions were issued upon the filing of the bill but, on defendants' motion, the injunction against the governor was dissolved and the bill as to him dismissed. The commissioner's demurrer to the bill was overruled and his appeal from the decree overruling the demurrer was allowed. The demurrer raises the points (1) that the bill is insufficiently verified; (2) that the averment that the exchange is not authorized by law and that the commissioner ought to be enjoined states conclusions of law; (3) that the plaintiff has not shown any interest which entitles him to an injunction; (4)

that the bill does not show that the commissioner is about to do any act in violation of law.

As a general thing injunctions ought not to issue upon statements of material matters made upon information and belief. In this case the proposed exchange is shown by the official notice published in the newspapers, the value and kind of lands proposed to be exchanged being largely a matter of information and belief. We consider that the bill properly presents the question of the legality of the proposed exchange and that it is properly verified.

The right of a citizen and taxpayer to obtain an injunction against official acts involving unauthorized use of public funds has repeatedly been adjudicated in this court. *Castle v. Minister of Finance*, 5 Haw. 27; *Lucas v. Amer. Haw. E. & C. Co.*, 16 Haw. 80; *Castle v. Secretary of the Territory*, Ib. 769. In the present case the bill does not show whether the loss of revenue from rent would be offset by rents from land of equivalent value or by a saving of revenue which otherwise would be used. In the absence of an averment of loss none can be inferred. The taxpayer would gain from the transaction pecuniarily if the Territory should thereby obtain property for such public uses as school houses, for instance, for which otherwise legislative appropriations would be made requiring increased taxation and in such cases the plaintiff's only interest would be his desire that the public land laws be correctly administered.

Perhaps a citizen and taxpayer's right to obtain injunctions to restrain official acts affecting public property ought not to be based on the pecuniary loss, howsoever trivial or conjectural, but on the broad ground that any citizen may obtain a judicial inquiry into the validity of such acts and an injunction against them if found to be unauthorized. In the view we take of the fourth question raised by the demurrer it is unnecessary to decide the question of the plaintiff's right to sue in this case.

The remaining question to be considered is whether the commissioner, by approval of the governor, has the power to make the proposed exchange. By Sec. 42 of the Civil Code of 1859,

the minister of the interior, by authority of the king in cabinet council had "power to lease, sell or otherwise dispose of the public lands and other property in such manner as he may deem best for the promotion of agriculture and the general welfare of the kingdom subject, however, to such restrictions as may from time to time be expressly provided by law." Chap. 24, Acts of 1874, requires consent of the privy council for sales of land above $5,000 in value, and Chap. 44, Acts of 1876, requires sales and leases of land of over $300 in value to be made only at public auction, but that this provision shall not apply to cases "where the government shall by quit claim, or otherwise, dispose of its rights in any land by way of compromise or equitable settlements of the rights of claimants, nor to cases of exchange, or sales of government lands in return for parcels of land required for roads, sites of government buildings, or other government purposes."

Sec. 42, as thus amended, and as further amended to conform to the constitution of 1894 and the Organic Act, is found in Secs. 252 and 254 R. L. Sec. 276 R. L., being Sec. 17 of the Land Act of 1895, with the amendments required by the Organic Act, is as follows:

"The commissioner may with the consent of the governor sell public lands not under lease, in parcels of not over one thousand acres, at public auction for cash. Upon any such sale and the payment of the full consideration therefor, a land patent shall be issued to the purchaser.

"And he may, with such consent, sell public lands not under lease in parcels of not over six hundred acres, at public auction, upon part credit and part cash, and deliver possession under an agreement of sale containing conditions of residence on or improvement of the premises sold, or of payment by instalments or otherwise of the purchase price, or all or any of such conditions.

"And in case of default in the performance of such conditions, the commissioner may, with or without legal process and without notice, demand or previous entry, take possession of the premises and thereby determine the estate created by such agreement. In case of such forfeiture, such land shall be sold at auction.

either as a whole or in parcels, for cash or on terms of time payments in the discretion of the commissioner; and if such sale shall result in an advance on the original price, the original purchaser shall receive therefrom the amounts of his payments to the government on account of purchase, without the interest and a pro rata share in such advance in proportion to the amounts of his payments. If such sale shall result, however, in a less price than the original, the amount returnable to him shall be charged with a pro rata amount of such decrease proportioned to the amounts of his payments. The treasurer is hereby authorized to pay the amount returnable to the outgoing tenant, upon the requisition of the commissioner, out of any funds available for such purpose.

"Which agreement shall entitle the purchaser to a land patent of the premises upon the due performance of its conditions.

"The commissioner shall have authority to fix any upset price for all such sales for cash or part credit and part cash.

"All such sales shall be held in Honolulu, or in the district where the land to be sold is situated. Any person designated by the commissioner may act as auctioneer at such sales without taking out an auctioneer's license.

"Provided, however, that land patents may be issued in exchange for deeds of private lands or by way of compromise upon the recommendation of the commissioner and with the approval of the governor without an auction sale, and further provided, that the governor may in his discretion upon such recommendation and approval, execute quit claim deeds for perfecting the titles of private lands where such titles are purely equitable or where such lands are suffering under defective titles, or in cases of claims to use of lands upon legal or equitable grounds."

Since by Sec. 75 of the Organic Act the superintendent of public works succeeds to the powers and duties of the minister of interior with reference to lands then under the control of the minister and as the commissioner of public lands succeeds to the powers and duties of the commissioners under the act of 1895, Sec. 252, R. L., declares that "The commissioner of public lands or superintendent of public works, as the case may be, by and with the authority of the governor, shall have power to lease, sell," etc. The power of the superintendent of public works to exchange public for private lands under his control is without

limitation as to the land to be given in exchange, the commissioner's power to exchange land under his control being such as is expressed in the proviso of Sec. 276, R. L. The attorney general's contention that the commissioner has power to exchange under Sec. 254, R. L., cannot be sustained since Sec. 75 of the Organic Act, transferring to the superintendent the powers and duties of the minister of the interior, is not limited by Sec. 73. *Pratt v. Holloway,* 17 Haw. 537.

Sec. 276, R. L., authorizes the commissioner to sell unleased public land at public auction in parcels of not over 1000 acres for cash, and partly for credit in parcels of not over 600 acres for residence and cultivation, concluding with the proviso with reference to exchanges and compromises without auction sale and quitclaiming the government title in cases of defective titles or legal or equitable claims. The plaintiff insists that this authority for issuing patents in cases of exchange or compromise is confined to parcels of not over 1000 acres not under lease on the ground that it is only to such land and such parcels that the provisos refer. The decision of the case depends largely upon the meaning of the words "provided however." They may mean the same as "but nevertheless," or "but notwithstanding what is above expressed," or "but anything hereinbefore contained to the contrary notwithstanding," in either of which expressions "but" conveys no other meaning than "and," and the power to exchange expressed in the proviso, if regarded as an independent power, would refer to any public land under the commissioner's control. While the commissioner is authorized to sell public land (1) not under lease, (2) in parcels of not over 1000 acres, (3) at public auction and (4) for cash (or partly for credit in case of the 600 acre parcels to be used for residence or cultivation) he is authorized to issue land patents in exchange for deeds of private lands without public auction upon his recommendation and the governor's approval. The exercise of this power is not expressly limited to unleased or 1000 acre parcels. Such limitation, if intended, would appropriately be expressed by inserting after the word "exchange" the words "of parcels of not over

1000 acres of unleased land." There are several reasons why such unexpressed limitations would not be implied. They ob· viously would be inapplicable to the cases of defective titles or legal or equitable land claims mentioned in the second proviso of the same paragraph as well as to cases of compromise mentioned in the first proviso. As the earlier act, Sec. 254, R. L., contains no limitation to unleased or 1000 acre parcels in cases of ex- change, compromise, etc., it would be reasonable to expect that if such limitation were intended in the later act it would be expressed.

It is urged, however, and with truth, that the Land Act of 1895 was intended, as shown in its various provisions, as a home- stead and settlement act, to furnish opportunities for small pro- prietors and that the withdrawal of public lands from purposes of the homestead act, although for other public purposes, lessens the important benefits to be derived from the act. Unquestion- ably the act ought to be construed, as far as reasonably is prac- ticable, so as to promote and not obstruct its clearly expressed objects, but such considerations do not justify the court in sup- plementing the act by provisions not therein expressed. More- over, while the restriction of sales to auction sales of not over 1000 acre parcels not under lease might secure better prices, the restriction does not prevent the same person from bcoming pur- chaser of any number of parcels. There would be no advantage to the public in dividing this land on Lanai into parcels within the 1000 acre limit and obtaining a surrender of the leases prior to an exchange. If the lands were thus divided and the leases cancelled it would be a matter of policy whether the parcels should be exchanged for other lands of equivalent value.

It is not averred that any of this land is agricultural land suit- able for settlers or homestead purposes. None but experts could decide upon the possibility of obtaining water for bringing waste or pastoral land under cultivation. One who is not an expert may or may not think that water could be obtained by conserving the rainfall or well boring. Expert knowledge is required to deter- mine whether as the leases terminate, if the lands should remain

unleased, nature would probably replace the forest or a devastation from floods and high winds would continue. Whether it would be better to trust to obtaining appropriations to make the lands of use for cultivation or to lease them under conditions requiring lessees to reforest or, on the other hand, to utilize opportunities of obtaining by exchange valuable property for immediate public uses is a question which requires for its decision the exercise of excellent judgment and forethought.

Upon the plaintiff's contention, as we understand it, while public land to any required extent under the superintendent of public works may be exchanged for "parcels of land required for roads, sites of government buildings or other government purposes" (Sec. 254, R. L.), all lands under the control of the commissioner are intended by the Land Act of 1895 to be used or disposed of by him only as pointed out in the act and to permit the exchange of leased land, although worthless for settlement or homestead purposes, would violate the spirit and intent of the act. It must be observed, however, that Sec. 254, exempting exchanges of land from the necessity of public auction, merely recognizes the power to make them which is implied in the power given by Sec. 252 to dispose of public lands; but Sec. 276 does more than to recognize the commissioner's power of exchange, it declares affirmatively that the power can be exercised, and without the requirement of public auction, the terms used being as broad as those of Sec. 252. The homestead act of 1895, while restricting sales and leases of land, allowing sales only of land not under lease, and providing that leases shall not be renewed while having more than two years to run, leaves the matters of exchanges of land and of compromises of land claims to the discretion of the commissioner and governor.

In *Oregon v. Hitchcock,* 202 U. S. 60, decided April 23, 1906, the State of Oregon filed a bill to restrain the secretary of the interior and the commissioner of the general land office from patenting to any Indan or other person certain lands which, on March 12, 1860, were swamp and overflowed lands, the State of Oregon claiming the lands under an act of Congress of March

12, 1860. The objection was made by demurrer that as the legal title to the lands was in the United States the suit did not lie since the United States, being the real party in interest, could not be sued without its consent. The court, after citing from *Minn. v. Hitchcock,* 185 U. S. 373, as follows: "Now the legal title to these lands is in the United States. The officers named as defendants have no interest in the lands or the proceeds thereof. The United States is proposing to sell them. This suit seeks to restrain the United States from such sale, to divest the government of its title and vest it in the State. The United States is, therefore, the real party affected by the judgment and against which in fact it will operate, and the officers have no pecuniary interest in the matter," then said: "The legal title to all these tracts of land is still in the Government. No patents or conveyances of any kind have been executed. There has been no finding or adjudication by the Land Department that the lands referred to were swamp or overflowed on March 12, 1860. Under those circumstances it is not a province of the courts to interfere with the Land Department in its administration. So far as a grant of swamp lands is claimed, it must be held that the grant is in process of administration, and, until the legal title passes from the Government, inquiry as to equitable rights comes within the cognizance of the Land Department. Courts may not anticipate its action or take upon themselves the administration of the land grants of the United States."

If the proposed exchange should secure land suited for homesteads and settlement it would clearly promote the objects of the land act and yet would be based on the same law under which land would be acquired for other public uses. This fact lends force to the view that considerable undefined discretion is necessarily left to the commissioner and governor, the exercise of which discretion cannot be controlled by injunction.

The decree appealed from is reversed, the demurrer is sustained and bill dismissed.

*G. D. Gear* and *A. G. M. Robertson* for plaintiff.

*E. C. Peters, Attorney General* and *F. W. Milverton, Deputy Attorney General,* for defendants.

CONCURRING OPINION OF FREAR, C.J.

I concur in the foregoing conclusions and will briefly state my views upon the main question only.

If the power exists to make the proposed exchange it must be under the law as set forth in section 252 or in section 276 of the Revised Laws.

I do not think the power exists under section 252. That section no doubt conferred the power until the passage of the comprehensive act of 1895 (R. L., Chap. 22), which inaugurated a new land policy and in its second section (R. L., Sec. 262),. divided the public land into two classes, one designed mainly for purposes of settlement, the other devoted mainly to public uses, and placed the first class under the min-- ister of the interior. From the passage of that act until the passage of the Organic Act of the Territory the powers con-- ferred by section 252 could be exercised by the minister of the interior alone and with reference to lands of the second class alone. The Organic Act by section 75 transferred the powers and duties of the minister with reference to lands of the second class, including the powers and duties conferred by section. 252, to the superintendent of public works, and by section 73 transferred the powers and duties of the commissioners of public lands as well as those of the minister of the interior as one of the commissioners to the commissioner of public lands. *Pratt v.. Holloway,* 17 Haw. 539. The commissioner, therefore, does not now have the powers conferred by section 252 unless congress intended by section 73 of the Organic Act to give him additional powers not previously possessed by the commissioners or minister,. namely, powers with reference to lands of the first class, which the minister, now superintendent, had and has with reference to lands of the second class under section 252. There evidently was no specific intention to do that. If it was done it was through the operation of the general provision of section 73 that "commissioner of public lands" should be substituted for "minister of the interior," but it is obvious that such substitution could not

be made consistently with the provisions of section 75 in every instance in the laws relating to public lands. Moreover, the powers of the commissioner of the kind now in question were already covered by section 276 of the Revised Laws. Section 252 also is by its terms made subject to such restrictions as may from time to time be provided by law, and the act of 1895 in its title and in section 86 (R. L., Sec. 344), purports to control that section (252). It is true that the commissioner of public lands is included with the superintendent of public works in section 252 as well as in several other sections of the same chapter. That chapter is of a general nature and at least some of its provisions apply to the commissioner as well as the superintendent, and both officers were included in section 252 as well as several other sections as a matter of caution, leaving the proper construction to the courts. And, although the Revised Laws were enacted to a certain extent by the legislature, it was beyond the power of the legislature, and it did not attempt (see L. 1905, Act 3, Sec. 2), to modify the laws relating to lands of the first class, although it has authority to modify those relating to lands of the second class. See Org. Act, Secs. 73, 75; also note to R. L., Ch. 20.

I think the power exists under section 276. That section provides that the commissioner with the consent of the governor may (1) sell public lands (2) not under lease (3) in parcels of not over 1000 acres (4) at public auction (5) for cash; also that he may with such consent (1) sell public lands (2) not under lease (3) in parcels of not over 600 acres (4) at public auction (5) for part credit and part cash upon conditions of residence or improvement; that upon payment of the consideration or performance of the conditions a land patent shall be issued to the purchaser; and concludes with the following provisos:

"*Provided,* however, that land patents may be issued in exchange for deeds of private lands or by way of compromise upon the recommendation of the commissioner and with the approval of the governor without an auction sale, and further *provided,* that the governor may in his discretion upon such recommendation and approval, execute quitclaim deeds for perfecting the

titles of private lands where such titles are purely equitable or where such lands are suffering under defective titles, or in cases of claims to use of lands upon legal or equitable grounds."

Do these provisos confer, as they purport to, general powers of exchange, compromise, etc., as distinguished from the restricted powers of sale conferred in the body of the section, or do they merely provide that such powers may be exercised without (1) a sale (4) at auction (5) for cash, which must be the case from their very nature, and must there be incorporated into them by implication the conditions that only lands (2) not under lease and (3) not over a specified area shall be subject to such powers?

Evidently the language of these provisos was suggested by or adapted from that of sections 252 and 254, which previously permitted the minister of the interior to transfer by way of exchange public lands of both classes, whether under lease or not and irrespective of area, and which, since the enactment of the act of 1895, which includes section 276, has conferred that power similarly unrestricted upon the minister, now the superintendent, as to lands of the second class. Apparently it was thought by the legislative body that the concurrence of the commissioners (now commissioner) and the executive council (now governor) under section 276 was a sufficient safeguard in cases of exchange of public lands of the first class just as the concurrence of the minister and executive council (now governor) formerly as to both classes and now the superintendent and governor as to the second class was and is deemed a sufficient safeguard under sections 252 and 254.

It is clear that the restrictions to lands not under lease and to parcels of not over the specified area cannot be implied in the second proviso, for not only is there no express exclusion of the restriction as to a sale at auction for cash from which the inclusion of the other restrictions might be implied, but the very nature of the powers conferred by that proviso, namely, to execute deeds for perfecting titles of private lands, excludes the idea of restrictions to lands not under lease or lands of not over a specified area; and if such restrictions cannot be implied in one

proviso why should they be implied in the other, especially when it would have been easy and natural to have expressed them in that proviso if they had been intended.

If the words "without an auction sale" had been omitted from the first proviso, there could be no question but that the restriction as to leases and areas could not properly be implied in that proviso, and yet those words add nothing to that proviso, for in that, as well as in the second proviso, the very nature of the transactions authorized is such as to exclude an auction sale, thus necessarily making the words "without an auction sale" redundant and suggesting that they were inserted without much thought or as a matter of course or with the same object for which section 254 was inserted, namely, to make clear, what would be the case without those words or without that section, that in the cases mentioned in these provisos and in that section no auction sale was required. This construction does not fail to give effect—and, too, the natural effect—to those words; the other construction gives them an unwarranted effect. Under either construction those words are surplusage from the very nature of the case so far as their direct meaning is concerned. To say that they were inserted for the ulterior purpose of showing that the restrictions as to leases and areas were intended to apply, would be to attribute to the legislature the selection of an obscure indirect method in preference to a plain direct method of accomplishing that purpose; it would be to read into the proviso two clauses of vast importance which would greatly limit the powers expressed and which the legislature did not even allude to in the provisos—merely in order that some special object might be found for the insertion of the words "without an auction sale." One construction does not expunge those words but allows them their natural effect; the other gives them an unnatural effect and makes them an excuse for adding other words to the provisos.

That these provisos were intended as grants of additional general powers and not mere modifications of powers conferred in the body of the section, is further shown by the fact that

they are powers of a different kind. The body of the section relates solely to sales and provides that sales shall be at public auction for cash or part credit and part cash and contains limitations as to the character and area of the lands that may be sold, while the provisos have nothing to do with sales, but, on the contrary, necessarily exclude, either expressly or by implication, all of the three requisites of a transfer under the body in the section, namely, (1) a sale (4) at public auction, and (5) for cash. The limitations, (2) and (3), as to what may be transferred, which were not expressed in the provisos, should not be implied to restrict transfers of a kind different from those upon which those limitations were expressly imposed in the body of the section.

The nature of the powers conferred in the first as well as in the second proviso would seem to exclude such limitations, for the powers given in that proviso must be construed, in the absence of a manifested contrary intention, to be as large as the objects to be accomplished for which those powers were given. For instance, if a patent is to be issued by way of compromise the circumstances of the case might require a patent of lands under lease or of a parcel of over 1000 acres. Likewise, if the private lands which may be desired are of much value it might be impossible to obtain them by way of exchange except by transferring a parcel of over 1000 acres or a parcel under lease. The object of the body of the section is to dispose of public lands, the payment of the consideration being incidental, while in the provisos the reverse is the case, the object being the acquisition of lands or the effecting of a compromise or perfecting of a title,—the issuance of a patent by way of exchange or otherwise being the incidental means of accomplishing the desired object.

The body of the act does not confer one power to which the provisos make exceptions, but confers two different powers similar in three features, namely, (1) sale, (2) not under lease, (4) at public auction, but differing in the other two features, namely, (3) in respect to the area, and (5) in respect to the terms of sale. If the provisos make exceptions merely in respect to three of these features, namely, 1, 4 and 5, (4 expressly; 1 and 5 by im-

plication), which is conceded, and do not make exceptions as to 2 and 3, as contended, then, conceding that feature 2, which is the same in both powers conferred in the body of the section, presents no inherent difficulty, the question presents itself from which of these two powers feature 3 is to be taken for incorporation into the provisos, this feature differing under the two powers. Under one power the area is limited to 1000 acres, under the other to 600 acres. It would seem that if the legislature had intended either of these restrictions to be operative in the provisos it would have expressed that intention and would have specified which restriction as to area was intended.

Thus from every consideration except that of the supposed dangerous extent and character of the powers conferred or that of the general spirit of the land act of 1895 as gathered from its other provisions, it would seem that the provisos confer independent grants of powers free from the restrictions imposed in the body of the section. It may be that these powers are dangerous in extent and character and may be exercised in such a way as to defeat to some extent other purposes of the act; and yet, as already shown, they are not more extensive and not of a character other than had previously existed beyond question as to both classes of public lands and now exist as to one class under sections 252 and 254; and they are not in themselves against the spirit of the land act as a whole, for the purposes of that act are various and include those of acquisition by exchange for public purposes as well as those of disposition by sale for settlement, and indeed the acquisition of lands in large tracts suitable for settlement in exchange for lands less suitable for settlement may be desired for the very purpose of disposition in small lots for settlement. Courts, however, cannot legislate or invade the provinces of the other departments of government in matters of policy. The extent to which power of the kind in question should be conferred upon executive officers is a question of policy for the legislative body; the exercise of the power in a particular case is a question of policy for the executive officers.

I dissent from the majority on the main question involved in this case, which is, whether or not the commissioner of public lands with the approval of the governor has the power to exchange for private lands more than 1000 acres of public land under lease.

If that power exists, it is to be found in Sec. 276 of the Revised Laws, which, as originally enacted, was a part of the "Land Act of 1895." That section is as follows:

"The commissioner may with the consent of the governor sell public lands not under lease, in parcels of not over one thousand acres, at public auction for cash. Upon any such sale and the payment of the full consideration therefor, a land patent shall be issued to the purchaser.

"And he may, with such consent, sell public lands not under lease in parcels of not over six hundred acres, at public auction upon part credit and part cash, and deliver possession under an agreement of sale containing conditions of residence on or improvement of the premises sold, or of payment by instalments or otherwise of the purchase price, or all or any of such conditions.

"And in case of default in the performance of such conditions, the commissioner may, with or without legal process and without notice, demand or previous entry, take possession of the premises and thereby determine the estate created by such agreement. In case of such forfeiture, such land shall be sold at auction either as a whole or in parcels, for cash or on terms of time payments in the discretion of the commissioner; and if such sale shall result in an advance on the original price, the original purchaser shall receive therefrom the amounts of his payments to the government on account of purchase, without the interest and a pro rata share in such advance in proportion to the amounts of his payments. If such sale shall result, however, in a less price than the original, the amount returnable to him shall be charged with a pro rata amount of such decrease proportioned to the amounts of his payments. The treasurer is hereby authorized to pay the amount returnable to the outgoing tenant, upon the requisition of the commissioner, out of any funds available for such purpose.

"Which agreement shall entitle the purchaser to a land patent of the premises upon the due performance of its conditions.

"The commissioner shall have authority to fix any upset price for all such sales for cash or part credit and part cash.

"All such sales shall be held in Honolulu, or in the district where the land to be sold is situated. Any person designated by the commissioner may act as auctioneer at such sales without taking out an auctioneer's license.

"Provided, however, that land patents may be issued in exchange for deeds of private lands or by way of compromise upon the recommendation of the commissioner and with the approval of the governor without an auction sale, and further provided, that the governor may in his discretion upon such recommendation and approval, execute quitclaim deeds for perfecting the titles of private lands where such titles are purely equitable or where such lands are suffering under defective titles, or in cases of claims to use of lands upon legal or equitable grounds."

Authority is thus given to the commissioner of public lands with the consent of the governor to sell public lands not under lease in parcels of not over 1000 acres at public auction. Upon fulfilling the conditions of the sale the purchaser becomes entitled to a land patent. The first proviso that "Provided, however, land patents may be issued in exchange for deeds of private lands * * * without an auction sale" has reference to what precedes, namely, land patents of not over 1000 acres. This is shown not only by the words "provided, however," which ordinarily and naturally refer to what precedes, but also by the use of the words "without an auction sale," thus implying that an auction sale was the only condition not a prerequisite to the issuance of a land patent in case of an exchange, leaving the other conditions prerequisite to the issuance of a land patent in force, namely, unleased public lands in parcels of not over 1000 acres. As to the natural meaning of a proviso see *Cooper v. Island Realty Co.*, 16 Haw. 98; Lewis' Sutherland's Stat. Con. 352.

The second proviso in Sec. 276 has reference to quitclaim deeds and has nothing to do with land patents, and so obviously no reference is made therein to any of the conditions prerequisite

to the issuance of land patents imposed in the main body of the section.

If the intention was to allow a power of exchange not limited to quantity or kind of land, why were the words "without an auction sale" specifically inserted in the proviso as being the only prerequisite not necessary to the issuance of a land patent in case of an exchange? To construe the proviso as authorizing an unlimited power of exchange requires the practical elimination of the words "without an auction sale" and treating them as surplusage. That such a construction is not justified see Endlich Int. Stat. 23.

It is argued that there is no limit to the right to exchange mentioned in Sec. 276 either as to the amount or kind of land because there is no limit to the right of exchange mentioned in Sec. 254, R. L. That argument is not sound for the reason that at the time of the passage of Sec. 254 there was an absolute right to lease, sell or otherwise dispose of the public lands in any amount and whether leased or unleased, and also for the reason that the section which preceded and to which Sec. 254 had reference (Sec. 253, R. L.), imposed the one condition of a public auction sale in cases of transfers of government lands, and that one condition was expressly not to be imposed in cases of exchange.

The power contended for by the commissioner of public lands is undoubtedly contrary to the spirit of the Land Act of 1895, which included this section 276, and which requires dispositions of public lands to be in small areas, undoubtedly for the reason of encouraging settlers and homesteaders and also of allowing others than the very wealthy the privilege of acquiring portions of the public domain. The majority recognizes that this exchange is contrary to the spirit of that act. In construing a doubtful provision of an act the act as a whole and its reason and spirit may be considered. See R. L., Sec. 12; *Ex Parte Higashi,* 17 Haw. 437. The course of legislation in these islands shows that the tendency has been to limit rather than to enlarge the power of disposing of public lands, and that was

recognized by Congress when it passed the Organic Act. How foolish it was to limit the amount and kind of public land which could be sold and at the same time to allow an unlimited power of exchange; and yet, according to the majority, that is exactly what the legislature of 1895 meant to do. If that is what the legislature meant, it is within the power of the commissioner of public lands and the governor to nullify the whole purpose and object of the Land Act of 1895 by exchanging all of the public domain under that act for, say, building sites in the city of Honolulu or other lands of equal or greater value, but unavailable and undesirable for the purposes of the act. If this exchange is permissible, any exchange is permissible. That the legislature intended to authorize any such power, in view of the clear purposes and objects of the act, I cannot and do not believe.

If there is a power to exchange land under lease, what becomes of Sec. 279 of the Revised Laws, also a part of the Land Act of 1895, which by its terms purports to give to the commissioner of public lands the only power he has in regard to the disposition of land under a general lease? There is no conflict between Secs. 276 and 279 if the power of exchange is limited to lands not under lease, otherwise there is. Every construction which leads to a conflict between two sections in the same act should be avoided. *Pratt v. Holloway,* 17 Haw. 544. See also *Bernier v. Bernier,.* 147 U. S. 246, where it is said that "It is a general rule, without exception, in construing statutes that effect must be given to all their provisions if such a construction is consistent with the general purposes of 'the act and the provisions are not necessarily conflicting. All acts of the legislature should be so construed, if practicable, that one section will not defeat or destroy another, but explain and support it. When the provision admits of more than one construction that one will be adopted which best serves to carry out the purposes of the act."

For the foregoing reasons it is my opinion that the decree appealed from should be affirmed.