W. R. CASTLE, S. B. DOLE and W. O. SMITH *vs.* JOHN M. KAPENA, Minister of Finance.

APPEAL FROM DECISION OF THE CHIEF JUSTICE GRANTING A WRIT OF MANDAMUS.

SPECIAL TERM, DECEMBER, 1883.

JUDD, C. J.; McCULLY and AUSTIN, JJ.

Citizens and taxpayers may bring mandamus against a public officer.

Mandamus lies against a Cabinet Minister, to compel the performance of purely ministerial duties.

Under the Loan Act of 1882, which prescribes that Government bonds, payable in United States gold or its equivalent, may be issued at not less than par, it is illegal to issue the bonds for Hawaiian silver half-dollars of less intrinsic value than their face value in United States gold coin.

Injunction, not mandamus, is the proper remedy to prevent a public officer from doing a contemplated illegal act, and decision of the Chief Justice reversed on this ground.

THE petition for a writ of mandamus was heard at Chambers, before Chief Justice Judd, who denied a motion to quash, and granted the writ as prayed for. Defendant appealed to the full Court. The facts are stated in the opinions of the Chief Justice and of the Appellate Court.

The decision of the Chief Justice, appealed from, was as follows:

OPINION OF JUDD, C. J., ON THE MOTION TO QUASH THE WRIT.

I am of the opinion that the petitioners, as citizens and taxpayers, have the right to sue out this writ. They have, as taxpayers, the right to endeavor to prevent a public officer from doing what is an injury to the public good. There are authorities on both sides of the question, but the current seems to be in favor of the right, and especially the case of *Crampton vs. Zabriskie*, 101 U. S., 609. This is a case decided in 1879 by the Supreme Court of the United States, and Mr. Justice Field, for the Court, says: " Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent the illegal creation of a debt which they, in common with other property hold-

ers of the county, may otherwise be compelled to pay, there is at this day no serious question."

To deny this right to a taxpayer would be to say that there is no remedy and no way by which a Minister of the Crown can be prevented from doing an illegal act. Impeachment is too shadowy and uncertain to be thought of as an adequate remedy. If only the Attorney-General can promote such a matter, the answer is that there has been no Attorney-General since May last, and it would be idle to expect an Attorney-General, who is one of the Cabinet, to commence proceedings against his own colleague.

A Minister is responsible to the King for his acts, and he is also responsible to the people for the faithful discharge of his duties. The respondent's motion to quash, which is more properly a demurrer, is overruled.

### Decision of the Chief Justice on the Merits.

Having given this matter considerable study and attention, and having arrived at a clear and decided opinion upon the question involved, I give my decision now, knowing also that delay would be injurious to the respondent.

I remark here that the petitioners are not amenable to criticism for having brought this action so late. They could have no standing in Court until the act complained of was about to be committed, and if proceedings had been commenced months ago it could be well answered that the application was premature, and the respondent was not about to act in the manner alleged. Moreover, if the act complained of is illegal at all, it was so at the inception and continues so throughout, and it loses none of its illegality by lapse of time.

I remark here that the ability of the Government to borrow money under the Loan Act of 1882 does not affect the vitality or existence of the Government. The authority was given by this act to borrow money for certain specific purposes named in the Act, and by Sec. 3 "no part of the money (thus raised) shall, on any pretence, be paid, used or applied, directly or indirectly, either temporarily or otherwise, to or for any public use or purpose other than the purposes respectively to which the same is hereby directed to be applied."

I presume the Legislature felt that the ordinary resources of the Government would be sufficient for its ordinary expenditures, and so have not authorized the borrowing of money for its ordinary expenditures.

So my decision in this case cannot affect the life or credit of the Government.

Whether the bonds of the Government have or have not been difficult of sale is foreign to this issue. If they have not been eagerly sought for, possibly it is because the interest, being only 6 per cent., is too low, being 3 per cent. lower than the legal rate of interest.

The authority of the Minister of Finance in the premises is to be found within the four corners of this Act.

Section 1 authorizes the Minister of Finance, under the direction of the King in Cabinet Council, to borrow on the credit of the Hawaiian Government, during a period of three years, sums of money not exceeding two million dollars, and the bonds to be issued therefor are (1st) to be issued *at not less than par ;* (2d) they are to bear interest not exceeding 6 per cent.; (3d) they are to be exempt from Government taxes ; (4th) they are to be redeemable in not less than five nor more than twenty-five years, and (5th) they are payable, principal and interest, in *United States gold coin or its equivalent.* The bonds must be issued in exact compliance with the law. They must be issued, says the Act, at not less than par. What is par ? All the lexicographers say that par is " exact equivalence, without discount or premium," that is, there must be received for these bonds the exact equivalent of the sum secured to be paid by them. They are to be paid in *United States gold coin or its equivalent,* and this must therefore be received for them.

If a promissory note calls for payment of £500 sterling, the par value would be £500 sterling and nothing less. Now, if the Minister of Finance proposes to dispose of these bonds for anything less than their face in United States gold coin or its equivalent, it is a violation of the law. It matters not if the silver half dollars which the respondent proposes to take for the bonds be current as money in this realm. The law says most distinctly that the bonds must not be sold for less than par, and as the silver

half dollars are far less in intrinsic value than their face value in United States gold coin, to sell the bonds thus is selling them for less than par.

The law of this Kingdom makes United States gold the standard of value and legal tender. This law must be administered by the Court, even if the community and the Government by common consent ignore its existence. No law is a dead letter to the Court. I may here say that the Act of 1880 providing for a National Coinage, authorizes the Minister of Finance "to purchase gold and silver bullion *with any moneys which may from time to time be in the Treasury*, and to cause to be coined therefrom gold and silver coins" of equal weight and fineness with United States gold and silver coins of the same denominations. That is, foreign coin already in circulation might thus be changed into Hawaiian coin, and this the Legislature thought would not probably disturb the currency very seriously. Silver is a commodity fluctuating in value, and it has been declining in value for some years, and the standard half dollar of the United States is, by the latest quotations, not worth in United States gold much more than forty cents. Being of the opinion that the bonds are proposed to be issued by the respondent for less than par, I grant the writ of mandamus.

I ought to say further that the 70th Article of the Constitution requires the Supreme Court to give its opinion to the King and the Cabinet "upon important questions of law, and upon solemn occasions." And the Justices of the Supreme Court are always ready to give their opinions to the Government when important steps are contemplated. In this instance the opinion of the Court was not asked.

Honolulu, December 14, 1883.

OPINION OF THE FULL COURT BY McCULLY, J.

The petitioners set forth that they are citizens and taxpayers of the Kingdom; that they are informed and believe that the respondent, in his official capacity, has prepared and is now about to issue bonds to the amount of one hundred and thirty thousand dollars, purporting to be pursuant to the Act of August 5, 1882, taking in payment therefor silver coins which are only about eighty-two per cent. of the value of United States gold coin,

whereas it is prescribed by the statute that they shall be issued not below par in United States gold coin or its equivalent. That by the proposed issue the petitioners, as citizens and taxpayers, would be injured ; that they have made a demand which the respondent has refused ; "Wherefore your petitioners pray that a writ of mandamus do issue out of this Honorable Court, requiring the said Minister of Finance to accept for said bonds only United States gold coin or its equivalent, and not to accept therefor the silver coins aforesaid, and not to issue such bonds except for their par value in United States gold coin or its equivalent, and for further relief," etc.

The return and answer of the respondent, denying the sufficiency in law and neglect of duty, etc., says that he is about to issue bonds to the amount and at the interest stated, and in accordance with the Act referred to by the petitioners ; denies that his intended issue is below par, and avers that ·he is about to issue the bonds at par ; denies that it is his duty to issue said bonds only upon receipt of their equivalent value in United States gold coin ; denies that he intends to receive or accept therefor coins of less value than the equivalent of the lawful money of this Kingdom, and (by amendment) avers that he is to receive for said bonds silver coin in half-dollar pieces of equal weight and fineness with United States silver coin of the same value, and lawful money of the Government of the Hawaiian Islands; and denies that he has refused any lawful demand.

It is evident that if the respondent were about to make a legal issue of bonds, the petitioners could obtain no order of the Court in restraint thereof. The Act referred to, which is Chap. XXIX of the Session Laws of 1882, provides by Section First as follows :

"The Minister of Finance, under the direction of the King in Cabinet Council, is hereby authorized to borrow on the credit of the Hawaiian Government, from time to time, during the period of three years after the passage of this Act, such sums not exceeding in the whole the sum of two million dollars, for the purposes in this Act hereinafter set forth, for which sums the Minister of Finance may cause coupon bonds to be issued from time to time, for such amounts each as he may deem advisable, such bonds to be issued at not less than par, and to bear interest not

exceeding 6 per cent. per annum, payable semi-annually, and said bonds to be exempt from any Government tax whatsoever, and to be redeemable in not less than five nor more than twenty-five years, the principal and interest being payable in United States gold coin or its equivalent."

The averment and argument of the petitioners is that the intended issue would be illegal, because issued at less than par. They aver that the silver coins, which the respondent admits he will receive, are worth only about 82 per cent. of the value of United States gold coin, and the respondent does not deny this in his answer, and concedes in argument that such is the relative intrinsic value of these silver coins. The bonds are payable, principal and interest, in United States gold coin or its equivalent. What is their par value ?

Par is the Latin word for *equal*. It has been adopted into the English language, and continues to have the same meaning and no other. Webster's Dictionary, in illustrating its meaning, says : "Bills of exchange are at *par*, above *par*, or below *par*. Bills are at par when they are sold at their nominal amount for coin or its equivalent." Bouvier's Law Dictionary uses the same terms.

Now, the nominal value, the value expressed in these bonds and their coupons, is ———— dollars, United States gold or its equivalent. When such bonds are issued or sold for the amount expressed in them, paid in United States gold or its equivalent, are they sold above par ? And if they are sold for any sums of money, not being the same amount in such gold or its equivalent, are they sold at par or below par ? These questions answer themselves; but it is not putting the case too strongly to say that eighty-two per cent. of a gold dollar is not equal or par to a gold dollar, although the eighty-two per cent. coin may, by usage or legal tender statute, circulate at a valuation of one hundred cents.

The statute under which these bonds may be issued determines the standard for their payment, irrespective of any other statute regulating currency, and their par value is the amount named in each bond in such expressed standard coin.

The question of the par value of bonds was considered in the case of "*The State of Illinois vs. Delafield*," 8 Paige, 526, and the

same, by appeal to the Court of Errors, in 2 Hill, 159, where the decree of the Chancellor was affirmed. Bonds of the State, issued for the purpose of making a canal, and by the statute required to be sold at not less than par, were sold by the defendant on credit, whereby the purchasers received interest for a term before the State received payment. This was held to be a sale at less than par, although it was shown that this allowance of interest was necessary to make up the cost of exchange in making the payment from New York to Illinois. Bronson, J., in delivering the opinion of the Court of Errors, says :

" The bonds were not to be sold at their market value, if less than the nominal sum secured by them. They were six per cent. bonds in all markets, and the Commissioners were forbidden by their power—the statutes of Illinois—to sell them at less than their par value. This can, I think, mean nothing else than pound for pound or dollar for dollar."

After quoting the illustration above, taken from Webster, the learned Judge continues :

" It is a question about par value, and if that does not mean in this case a dollar in money for every dollar of security, the wit of man cannot tell us what it does mean."

It will be noticed that the case at bar resembles in sundry particulars the case above stated. Our Act provides for a loan for certain purposes, which are specified, and what amounts from the loan may be applied to each, if the loan shall be made. The authority to the Minister is an authority to issue at not less than par. Our bonds are to be six per cent. bonds in all markets, and payable in United States gold coin. The language of the Court is a full reply to the argument made for the respondent, that a construction of the Act to require that these bonds be sold at par, in United States gold, or its equivalent, would defeat the statute, and therefore, to effectuate the statute for a loan, it must be construed so that a loan can be made ; and that, as United States gold or its equivalent cannot be got for the bonds, something of less value mnst be taken. The Minister of Finance is not held to secure the sale of the bonds. It is only his duty, when directed by the King in Cabinet Council, to make the loan,

4

to offer it upon the terms and with the limitations prescribed by the statute, the sole authority for the bonds. If they cannot be placed accordingly, the loan fails.

In this view, the Minister, in issuing the bonds below par, was about to do an illegal act. No doubt a loss and injury would accrue to the country thereby, and to every taxpayer; and the question is raised, whether the petitioners can resort to this Court to protect themselves.

It is said, for the respondent, that as the petitioners suffer no special and private injury, they cannot claim a standing in Court. There is authority for this position. Under some circumstances, it would be for the Attorney-General, or officer occupying an analogous position, to bring proceedings. In some cases, private parties, moving proceedings for mandamus or injunction, bring it in the name of the Attorney-General, and permission to do so is accorded as of course.

*Merrill vs. Plainfield*, 45 N. H. 126, may be cited as one of the cases supporting the right of individuals to bring action in a public matter; the Court saying that as the town by vote undertook to appropriate money in a manner unauthorized by law, any person who is a taxpayer in town, and liable to be assessed for any part of such sum, may properly interfere to prevent its payment and misapplication, and granted a perpetual injunction.

The principal objection to permitting suits to be brought by private taxpayers, is said to be the annoyance to public officers by a multiplicity of suits. The answer to this, as well as the doctrine in such cases, is set forth in a recent case in the Supreme Court of the United States, *Crampton vs. Zabriskie*, 101 U. S. Reports, heard in 1879. We quote the language of Mr. Justice Field at large:

"Of the right of resident taxpayers to invoke the interposition of a Court of Equity to prevent an illegal disposition of the moneys of the county, or the illegal creation of a debt which they, in common with other property holders of the county, may otherwise be compelled to pay, there is at this day no serious question. The right has been recognized by the State Courts in numerous cases, and from the nature of the powers exercised by municipal corporations, the great dangers of their abuse, and the

necessity of prompt action to prevent irremediable injuries, it would seem eminently proper for Courts of Equity to interfere, upon the application of the taxpayers of a county, to prevent the consummation of a wrong, when the officers of those corporations assume, in excess of their powers, to create burdens upon property holders. The Courts may be safely trusted to prevent the abuse of their process in such cases."

Another United States Supreme Court authority is *U. P. Rail road Company vs. Hall*, 91 U. S. 343, in 1875, where Strong, J., says:

"There is a decided preponderance of American authority in favor of the doctrine that private persons may move for a mandamus to enforce a public duty, not due to the Government as such, without the intervention of the Government law officer."

It is apparent that if there is to be a proceeding in the case at bar, it must be brought by some other person than the Attorney-General. The Attorney-General is bound by the statute defining his office to appear in defense of actions brought against Government officers. He does so in this case, and the respondent herein acts under the direction of the King in Cabinet Council, of which the Attorney-General is a member.

But does the jurisdiction of the Court extend to the King's Minister, acting under the direction of the King in Cabinet Council? He is an Executive officer, at the head of one of the Departments of the Government, and the Constitution provides that the three branches of the Government—the Executive, the Legislative and the Judicial—shall be forever distinct. We find an explication of the state of this question in High's Extraordinary Legal Remedies, Sec. 118, to this effect:

"The jurisdiction of the Courts by mandamus over Executive officers, including Governors of States, heads of Executive Departments of the General Government, etc., has given rise to questions of much difficulty, and not a little conflict of authority has resulted from the efforts of the Courts to apply the law of mandamus to such cases. Especially is there a difficulty with regard to the control of the Courts by mandamus over the Chief Executive." It is settled, and it was conceded by all counsel in argument of the case at bar, that mandamus would not lie to

compel purely executive or political functions and duties necessarily involving the exercise of official judgment and discretion.

The respondent here is not the Chief Executive, and we must look for our precedents to cases where mandamus has been sought to be applied to the heads of the Executive Departments, such as Cabinet Officers and State Secretaries.   The writ has been granted in England to the Lords of the Treasury to compel payment of a pension ; supported on the two grounds of a clear legal right on the part of the claimant, and the absence of any adequate remedy at law, in the ordinary course of proceedings.   See 4 *Ad. & El.*, 286; also, *Regina vs. The Lords of the Treasury*, in re the Queen Dowager's Annuity, reported in 4 Eng. Law & Eq., where Lord Campbell, C. J., said no objection could be made to the jurisdiction of the Court to issue the writ of mandamus to the Lords of the Treasury.

The absence of other remedy is always a strong consideration in the application of extraordinary remedies.   The remedy of impeachment is suggested for this case.   If these bonds shall be issued illegally, and at a loss to the taxpayers of the Kingdom, the impeachment of the Minister, if carried, while it discredits him, does not make good the loss to the country, nor recall the bonds ; and the Minister may not be in office when the Legislature next meets.   Impeachment would not be an adequate remedy.   Do other remedies lie ?   and is a Cabinet Minister amenable to the Court ?

Our own statute concerning mandamus, Chap. 39, of the Acts of 1876, Sec. 5, is, that " It (the writ) may be directed to public officers to compel them to fulfill any of the duties attached to their office, or which may legally be required of them."   If a Minister is a public officer, he must be included, for he is nowhere excluded from the force of the above provisions.   It is claimed for him that he is not in that respect a public officer, for he is a part of the head Executive, and the Crown is not personally subject to the jurisdiction of the Court.   But the Constitution provides that the Ministers are responsible.   It would be an intolerable doctrine in a constitutional monarchy, to extend the inviolability of the Sovereign to his Ministry ; to claim that what is directed to be done by the King in Cabinet Council, and is done by any of his

Ministers, is to be treated as the personal act of the Sovereign. Art. 42. "No act of the King shall have any effect unless it be countersigned by a Minister, who by that signature makes himself responsible."

The application of the above quoted section 5 of the Mandamus Act must be carefully made, according to the principles partially expressed above respecting matters of discretion. The Courts will not undertake to guide the judgment and discretion of public officers, which would be to assume the supervision of all branches of Government; but will only intervene to compel the performance of purely ministerial duties. See *United States vs. Guthrie*, 17 How. 284; *Brashear vs. Mason*, 6 How. 92; *Kendall vs. United States*, 12 Pet. 524; *Decatur vs. Paulding*, 14 Pet. 497. To that jurisdiction the Ministers of the Crown, and all other public officers in this Kingdom, are subject.

But it must have been perceived that the statute, of which we have quoted Section 5, as well as all the authorities we have cited, refer to the performance of some duty. This is indeed the nature of a mandamus—a command to do something. What is it here prayed that the Minister of Finance is commanded to do? *First*, to accept for such bonds only United States gold or its equivalent; *second*, not to accept therefor the silver coins aforesaid; *third*, not to issue such bonds except for their par value in United States gold coin or its equivalent.

These are all prayers for a command to *do not* certain acts or act—that is, for a restraint or injunction.

What is the province of a writ of mandamus, as compared with a writ of injunction, is set forth in Section 6, of High on Extraordinary Legal Remedies.

"A comparison of the writ of mandamus, as now used in both England and America, with the writ of injunction, discloses certain striking points of resemblance, as well as divergence, in the two writs. Both are extraordinary remedies; the one the principal extraordinary remedy of Courts of Equity, the other of Courts of Law, and both are granted only in extraordinary cases, where otherwise these Courts would be powerless to administer relief. Both, too, are dependent, to a certain extent, upon the exercise of a wise judicial discretion, and not grantable, as of

absolute right, in all cases. It is only when we come to consider the object and purpose of the two writs, that the most striking points of divergence are presented. An injunction is essentially a preventive remedy; a mandamus a remedial one. The former is usually employed to prevent future injury, the latter to redress past grievances. The functions of an injunction are to restrain motion and enforce inaction—those of a mandamus to set in motion and compel action. In this sense an injunction may be regarded as a conservative remedy, mandamus as an active one. The former preserves matters in *statu quo*, while the very object of the latter is to change the status of affairs and to substitute action for inactivity. The one is therefore a positive or remedial process; the other a negative or preventive one."

We cannot command that the respondent borrow money and issue the bonds, for it is clearly discretionary with the King in Cabinet Council to direct, and with the Minister to offer them. We cannot compel the Minister to take United States gold or its equivalent, for he may not be able to get it. If no takers are found on the terms prescribed, the bonds cannot be issued at all. It is impossible to compel the Minister of Finance to take what is not offered. What was sought was to enjoin the Minister from taking silver half-dollars for gold par bonds, an act which we have pronounced illegal. But the distinction between mandamus and injunction must not be nullified. This Court is not disposed to enforce technicalities. But this is not a technicality. It goes to the very essence of the remedy applied for, and could properly have been raised by demurrer, as it is a matter apparent on the face of the petition.

Here are two forms of proceeding, having different origins and plain differences in application. The petitioners ask for the one remedy, while the case essentially demands the other. The issue of mandamus on this state of facts would afford a precedent for a disregard of modes of procedure which it is important to preserve, and for which we find no authority.

The writ is therefore discharged.

*Mr. Hartwell*, for petitioners.

*Mr. Attorney-General Neumann* and *Mr. Preston*, for respondent.

Honolulu, January 2, 1884.