Rafael A. Buscaglia, Treasurer of Puerto Rico et al., Petitioners, *v.* District Court of San Juan, Respondent.

No. 18. Argued July 14, 1944.—Decided July 28, 1944.

*Jesús A. González, Acting Attorney General, Miguel Guerra-Mondragón,* and *E. Campos del Toro,* for petitioners. *F. Fernández*

*Cuyar* and *H. González Blanes* for plaintiff in the main action. *E. Ramos Antonini* and *V. Gutiérrez Franqui* for interveners.

MR. CHIEF JUSTICE TRAVIESO delivered the opinion of the court.

This is perhaps one of the most important cases ever submitted for decision by this court in the history of this court. It involves serious social problems and legal questions which are intimately related. Among them is the determination of the rule which shall prevail in this jurisdiction as to the standing of a taxpayer to bring an injunction proceeding such as that involved herein.

Before stating, considering, and deciding the three fundamental questions involved in this suit, it is desirable to make a resumé of the facts about which there is no controversy.

On November 27, 1942, the Legislature of Puerto Rico approved Act No. 16 (Second and Third Special Sessions of 1942, p. 50), the essential purposes of which, as they appear in its title and statement of motives (§ 1), were: to declare the existence in Puerto Rico of a state of grave emergency created by the war; to authorize work emergency programs; to give work to the unemployed; to authorize projects of unemployment compensation, relief, lowering of prices and the planting and distribution of food products, etc. The management and supervision of the emergency program were entrusted to an Insular Emergency Council composed of the Governor and the Chiefs of the eight Departments of the Insular Government, including the Auditor of Puerto Rico.

To carry out the aforesaid purposes, § 14 of said Act appropriated "the sum of $10,000,000 out of any funds in the Treasury of Puerto Rico not otherwise appropriated, plus seventy (70) per cent of the revenues of the Insular Treasury from the proceeds of the Federal Internal-Revenue Tax on distilled spirits shipped or which may be shipped from

Puerto Rico to the United States from and after November 1, 1942.'' According to said § 14, the ten million dollars of the general funds of the Insular Treasury were to be spent as follows:

In the emergency work program_____$4,000,000
In the work projects in connection with the planting and
    cultivation of food products_____ 4,000,000
In unemployment compensation, relief, lowering of prices,
    subsidies, etc._____ 1,100,000
To increase distribution facilities_____ 900,000

The funds obtained from the excise tax on alcohol should be dedicated to the following purposes:

In the emergency work program and in the planting and cultivation of food products, not less than 50 per cent of the total revenues of the Insular Treasury from the above source.

In the projects of unemployment compensation, relief, lowering of the prices of commodities, subsidies, etc., not less than 20 per cent of the total revenues of the Treasury from the aforesaid federal tax.

The aforesaid Act No. 16, being of an urgent nature, became effective immediately after its approval, to wit, November 27, 1942. Six months later, on May 15, 1943, there was approved Act No. 181 (Laws of 1943, p. 654), by virtue of which the title of Act No. 16 of 1942 was amended, in order ''to appropriate funds for the Public Welfare Division of the Department of Health, for school lunch-rooms for nursery schools, and for free surplus fund distribution.'' Section 14 of Act No. 16 was amended and drafted to read as follows:

''Section 14.—To carry out the purposes of this Act, the sum of sixteen million (16,000,000) dollars, *or such part thereof as may be necessary in any fiscal year, in the judgment of the Insular Emergency Council,* is hereby appropriated out of any funds in the Treasury of Puerto Rico, not otherwise appropriated; *Provided,* That

of the total amount of this appropriation, the sum of four million (4,000,000) dollars shall not be available until July 1, 1943, etc.'' (Italics ours.)

Section 14, as amended, provides that the $16,000,000 are to be allocated as follows:

For the emergency work program—not less than 50 per cent of the total amount of the appropriation to be devoted to work projects connected with the planting and cultivation of food_____$11,500,000

For the projects of unemployment compensation relief, lowering of the prices of articles, subsidies, loans and general financial assistance_____ 2,300,000

For the "Public Welfare Fund—Trust Fund" of the Public Welfare Division in the Department of Health 1,500,000

For school lunch-rooms_____ 350,000

For free surplus-food distribution_____ 200,000

For nursery schools_____ 50,000

Act No. 181 of 1943 ends by providing in § 3 that its provisions ''are made retroactive to the date on which said Act No. 16, approved November 27, 1942, became effective, the same as if said Act had been originally approved in the form in which it has been amended by this Act; *Provided,* That any amount which has been set up on the appropriation books in accordance with said Act No. 16, approved November 27, 1942, *shall be considered as part of the total amount appropriated by this Act.''* (Italics ours.)

On June 29, 1944, Mr. Celestino Iriarte Miró, as a taxpayer, filed in the District Court of San Juan a petition for injunction against Mr. Rafael Buscaglia, in his capacity as Treasurer of Puerto Rico, and Mr. Rafael de J. Cordero, in his capacity as Auditor of Puerto Rico, and against Messrs. Antonio Fernós Isern, Jesús A. González, José M. Gallardo, Rafael Buscaglia, Sergio Cuevas, Luis A. Izquierdo, Manuel A. Pérez, and Rafael de J. Cordero, as members constituting the Insular Emergency Council. The petition, after making detailed allegations with regard to the approval and con-

tents of Act No. 16 of 1942 and Act No. 181 of 1943, alleged, in short, as follows:

That on February 15, 1944, due to a report rendered to the Legislature of Puerto Rico by the Treasurer and Auditor of Puerto Rico, a bill was presented in the Senate, as S. B. No. 28, to appropriate from any funds available in the Insular Treasury of Puerto Rico, not otherwise disposed of, the sum of $21,500,000, which sum would be placed at the disposal of the Insular Emergency Council for the purposes specified in Act No. 16 of 1942, as amended; that said bill provided that the sum of $21,500,000 was appropriated in addition to the $16,000,000 appropriated by Act No. 181 of 1943; and that said bill was not passed by the Legislature of Puerto Rico.

That on March 7, 1944, H. B. No. 130 was presented in the House of Representatives of Puerto Rico, drawn subtantially in identical terms and for the same purposes as S. B. No. 28 to which we have already referred; and that said H. B. No. 130 was likewise not passed by the Legislature.

That the sum of $16,000,000 appropriated by Acts No. 16 of 1942 and No. 181 of 1943, is completely exhausted, the same having been allocated by the Insular Emergency Council to projects and disbursements already approved, for which reason the Insular Emergency Council, from and after July 1, 1944, will not have at its disposal any money coming from said appropriation of $16,000,000.

That the defendants intend and propose to utilize an additional sum of $16,000,000 from the ordinary funds of the Insular Treasury, from and after July 1, 1944, and to allocate said sum to the aims and purposes of Act No. 16 of 1942, as amended by Act No. 181 of 1943, all of this in spite of the fact that the Legislature has not appropriated the additional sum of $16,000,000 and that twice it refused to appropriate any additional funds.

That the appropriation and use of the additional $16,000,000, without any statute or law authorizing the same, amount to an illegal act and contrary to the Organic Act of Puerto Rico and to an undue and *ultra vires* use of legislative authority by executive and administrative officers.

The petitioner concludes by averring that the funds that the defendants intend to use are ordinary funds of the Insular Treasury derived from taxes levied and assessed on the petitioner and on all other taxpayers of Puerto Rico; that the plaintiff and all other said taxpayers are the owners in equity of said ordinary funds; that the undue and illegal use of said funds will cause irreparable damages to the petitioner and to all other taxpayers who will be required to pay new taxes to cover the deficiency created by such illegal use; and, finally, that the petitioner lacks any other adequate, speedy, and effective remedy, except that of injunction.

The defendants having been summoned to show cause why the preliminary writ of injunction prayed for should not issue, they appeared on July 7, 1944, and filed their answer. The essential parts of the same are as follows:

1. It is admitted that the defendants intend to utilize the additional $16,000,000 of the ordinary funds of the Insular Treasury for the purposes provided in the acts in controversy, but it is denied that there is no legislative appropriation of said additional sum. In support of this contention, it is alleged that the House of Representatives approved an appropriation of $21,500,000 and the Senate another appropriation of $23,000,000 for war emergency work, but it is admitted that neither of these two appropriations was approved by both Houses. It is averred that the discrepancy between both Houses was caused by H. B. 130, by virtue of which an Insular Emergency Council was proposed to be created, composed, among others, of four members appointed by the Governor, each of them to be recommended by the

Central Directing Organization of each of the political parties the candidate of which for the office of Resident Commissioner in the preceding general election received 10 per cent or more of the total vote cast for all candidates for the said office of Resident Commissioner. That for the purpose of obtaining passage of a compromise, the Senate approved S. B. 144, by virtue of which discriminations for political reasons in the emergency work and relief program were prohibited and punished as public offenses; and that it was due to these discrepancies of a fundamental nature between the House and the Senate "that at the termination of the preceding fiscal year the appropriations necessary for the support of the war emergency activities of the Government were not approved by the Legislature."

The defendants alleged that the appropriation of the additional $16,000,000 was not illegal or *ultra vires* and that on the contrary "the same is legal and constitutional, not only because it amounts to a continuance and permanent appropriation, but also because it amounts to an automatic re-appropriation of funds necessary for the support of the Government of Puerto Rico."

Defendants maintained that the refusal of the Legislative Assembly to appropriate, during the ordinary session of 1944, additional funds for the emergency program, "operated as an automatic re-appropriation of the original sum of $16,000,000, in accordance with § 34 of the Organic Act of Puerto Rico."

Defendants presented several special defenses, the only ones worthy of consideration being the following:

(*a*) That the plaintiff lacks a real, effective, and true interest at law qualifying him to bring this action.

(*b*) That the Auditor of Puerto Rico has exclusive authority to pass on the legality of the disbursements of the Government of the Island.

After duly obtaining leave from the district court, the municipalities of Caguas, Salinas, and Patillas and also some of the persons who receive $7.50 per month from the war emergency plan, intervened in the proceedings. For the sake of brevity, we shall refrain from summarizing the defenses presented by the interveners, as they are identical to those raised by the defendants.

On July 12, 1944, the District Court of San Juan issued a restraining order prohibiting the defendants from "carrying out, executing, completing or making any appropriation or from using any sum of money derived from the ordinary funds of the Insular Treasury of Puerto Rico with the object of placing the same at the disposal of the Insular Emergency Council for the aims and purposes provided in Act No. 16 of 1942, as amended; prohibiting them, furthermore, from continuing to disburse or spend said funds for the aforesaid aims and purposes." The order provides that the sums shall not be effective until the petitioner gives a bond for the sum of $5,000; and that the restraining order shall be effective "until this court enters an order or renders judgment in the present case in connection with the preliminary injunction prayed for, or in connection with the permanent injunction, provided the court decides that it has jurisdiction to enter a final judgment in connection with the petition for a permanent injunction."

As soon as defendants were served with a copy of the restraining order, on July 12, 1944, they appeared before this court praying for a writ of certiorari to review the order entered by the court below. The writ was issued and at the request of the defendants, and in aid of the effectiveness of the jurisdiction of this court, we also issued an order staying the effects of the restraining order appealed from, until this court had an opportunity to hear the parties and to decide the question in controversy on its merits.

On July 14, 1944, the hearing of the proceeding was held. The parties in interest, all of them represented by learned counsel, were fully heard, the case being finally submitted for our decision.

As an extract or essence of the able oral arguments and of the briefs submitted by counsel for the parties to the suit, three fundamental legal questions arise. We shall state, discuss, and decide them in the following order:

■ First: Does taxpayer Celestino Iriarte Miró have some special interest of such a nature as to qualify him to bring the proceeding for injunction, to which he has resorted in the present case?

Both parties have accepted that there is no disagreement among the authorities as to the right of a taxpayer to restrain by injunction the illegal expenditure of municipal funds. Some decisions are based on the analogy existing between a municipal corporation and a private corporation (IV Dillon, Municipal Corporations, 5th ed., § 1580). Others consider taxpayers as owners in equity of the public funds.

It is also beyond question that federal decisions have laid down in a definite manner the doctrine that denies to the taxpayer the right to enjoin the use of federal funds. See *Massachusetts* v. *Mellon,* 262 U. S. 447, 67 L. ed. 1078; *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, 82 L. ed. 374; *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 84 L. ed. 1108.

In most state jurisdictions, the taxpayer is allowed to appear before a court of equity to enjoin the illegal or unauthorized use of state funds. These decisions are based on the ground that, as a matter of fact, no difference whatsoever exists between municipal and state officers.[1]

---

[1] *Leckenby* v. *Post Printing and Publishing Co.,* (1918) 65 Colo. 443, 176 Pac. 490; *Rockne* v. *Olson,* (1934) 254 N.W. 5 (Minn.); *Wertz* v. *Shane,* (1933) 249 N.W. 661 (Iowa); *Reid* v. *Smith,* (1940) 375 Ill. 147, 30 N.E. (2d) 908. See also *Conway* v. *New Hampshire,* (1938) 199 A. 83, 86; *Page* v. *King,* 131 A. 707; *Sun Cab Co.* v. *Cloud,* (1932) 159 A. 922; *Stewart* v. *Stanley,* (1941) 199 La. 146, 5 So. (2d) 531; *Goods* v. *Tyler,* (1939) 186 So.

It has been held in other jurisdictions that the mere fact of being a taxpayer does not entitle one to sue state officers. Special damages have to be alleged and proved.[2]

The case at bar presents a question of a local nature. We are, therefore, at liberty to lay down for this jurisdiction the rule that we may deem most appropriate in conformity with our peculiar governmental situation. To that effect we are not bound to follow the federal rule established in the case of *Massachusetts* v. *Mellon, supra*. And we are inclined to accept as more reasonable the rule laid down by the majority of the state jurisdictions, which recognizes the right of the taxpayer to appear in a court of equity to restrain the use, without prior legislative authorization therefor, of state funds by executive officers of the state. The recognition of that right is needed more in Puerto Rico than in state communities. In the latter, the executive chief or the chiefs of departments, if they act *ultra vires* or without authorization from the Legislature and make illegal use of public funds, may be submitted to "impeachment" proceedings and punished for their illegal acts. If in Puerto Rico, whose Legislature lacks authority to bring "impeachment" proceedings and whose high executive officers do not derive their authority and power from the consent of the governed, we adopted the rule followed by a minority of the state jurisdictions and ignored the fact that the modern tendency is in the direction of acknowledging the right of the taxpayer to sue those who make illegal use of public funds,

129; *State* v. *Kelly*, (1937) 274 N.W. 319; *Fisher* v. *Marsh*, (1925) 113 Neb. 153, 202 N.Y. 422; *Castillo* v. *State Highway Commission*, (1925) 312 Mo. 244, 279 S.W. 673; *Castle* v. *Kapena*, 5 Hawaii 27, 28; *Hall* v. *Bland*, 148 S. 601; *Carso* v. *Board, etc.*, (La. 1944) 17 So. (2d) 358.

[2] *Crews* v. *Beattie*, (S.C.) 14 S.E. 2d 351; *State* v. *Showalter*, (Wash.) 293 P. 1000; *Sanders* v. *Ballard*, (Ga.) 127 S.E. 851; *State* v. *American*, (Tenn.) 72 S.W. (2d) 775; *Pierce* v. *Smith*, (Kan.) 29 Pac. 365; *Deering* v. *Martin*, (Fla.) 116 S. 54; *Milwaukee, etc.* v. *Hill*, 241 N.W. 364; *Asplund* v. *Hannett*, 31 N.M. 641, 294 P. 1074.

we would have to admit that in this jurisdiction the illegal act of making unauthorized use of public funds could be committed without there existing an effective remedy to avoid or punish the same. We would have to confess that in Puerto Rico the legal maxim *ubi jus, ibi remedium* has no meaning.

In 50 Harvard Law Review, 171, 231, 237, and under the title "Simpson, Fifty Years American Equity," we find this eloquent defense of the right of the taxpayer to intervene in cases of this sort:

". . . In many large American cities and some states it has come to be increasingly difficult to ensure, or even to promote, official honesty or law observance by placing the power to restrain the extravagance or cupidity of any public officer in the hands of another. *Quis custodiet custodes?* While the taxpayers' suit is far from being a wholly satisfactory means for promoting a minimum of state or municipal fiscal decency, it has proved useful where permitted. If some public-spirited (or angry) citizen is moved to sue and is able to secure an injunction against illegal expenditures, the effect on the public purse is far more apt to be salutary than if the matter 'awaits the verdict of the people at the polls'—a phrase which well deserves to rank with that much-abused word 'patriotism' in Samuel Johnson's definition.

"* * * * * * *

". . . The processes of equity have, however, proved themselves to be a practically indispensable aid to effective government under modern conditions, and have often served as a salutary check upon illegal official action."

Against the alleged right of the petitioning taxpayer, it is alleged that his interest is so small and that the damage that may be caused to him so uncertain, that the writ of injunction prayed for to stop the continuation of the illegal expenditure of public funds would not be justified. We are not convinced by this argument. Although the action herein brought may not be considered strictly as a class suit, it may and ought to be considered as a suit of a public nature. As said in *Stewart* v. *Stanley, Att. Gen.,* 5 So. (2d) (La. 1941) 531, 536: "If a taxpayer cannot complain, who else would

have that right?"[3]

The State of Louisiana is one where the substantive phase of the law, the same as in Puerto Rico, is governed by a Civil Code and not by the common law prevailing in most of the remaining states of the Union. When the Legislature of the State of Louisiana desired to limit the scope of the jurisdiction of the courts to grant a restraining order against government officers, it did so expressly by law in the year 1942 (Laws of 1942, No. 132, § 1).

The Territory of Hawaii, whose political relations and ties with the states are somewhat similar to ours, has recognized the right of the taxpayer to apply for an injunction to restrain a public officer from carrying out an illegal act harmful to the public treasury. In the case of *Castle* v. *Kapena, Minister of Finance*, 5 Hawaiian Rep. 27, the defendant Minister attempted to issue government bonds in accordance with the law, but was ready to accept in payment of said bonds silver coins whose value was only 82 per cent of the value of gold coin of the United States. The law provided that the bonds were not to be issued for less than their par value in gold or its equivalent. Castle, a taxpayer, appeared before the Supreme Court of the Territory of Hawaii praying for a writ of mandamus. The court was of the opinion that mandamus did not lie, but that the writ of injunction did lie and expressed itself thus:

"In this view, the Minister, in issuing the bonds below par, was about to do an illegal act. No doubt a loss and injury would accrue to the country thereby, and to every taxpayer; and the question is raised, whether the petitioners can resort to this Court to protect themselves.

"It is said, for the respondent, that as the petitioners suffer no special and private injury, they cannot claim a standing in Court. There is authority for this position. Under some circumstances, it

---

[3] Other cases from Louisiana upholding the same rule are *Donaldson* v. *Police Jury*, 109 So. 34; *Borden* v. *Louisiana Board of Education*, 123 So. 655; and *Graham* v. *Jones*, 3 So. (2d) 761.

would be for the Attorney General, or officer occupying an analogous position, to bring proceedings. . . .

''The absence of other remedy is always a strong consideration in the application of extraordinary remedies. The remedy of impeachment is suggested for this case. If these bonds shall be issued illegally, and at a loss to the taxpayers of the Kingdom, the impeachment of the Minister, if carried, while it discredits him, does not make good the loss to the country, nor recall the bonds; . . . Impeachment would not be an adequate remedy.''

In *Castle* v. *Secretary of the Territory,* 16 Hawaiian Rep. 769, the Supreme Court of Hawaii ratified its decision in the former case by stating:

''The right of a taxpayer to bring suit to restrain a public officer from doing an illegal act has been settled in this jurisdiction since the case of *Castle et al* v. *Kapena,* 5 Haw. 27 (1883) . . .

''The disposition of public funds is no moot or abstract question but vitally concerns every taxpayer. We trust that the time will never come in Hawaii when taxpayers shall not care to seek by appropriate proceedings in court to avert unlawful use of public money in connection with an unconstitutional statute. But there is something far more important than such exhibitions of public spirit on the part of taxpayers, and that is a feeling of confidence that courts will interpret the laws and declare the law with judicial impartiality unbiased by personal feeling or motive.''

The decisions cited by the taxpayer in support of his right to pray for a writ of injunction are numerous and very convincing. We shall merely cite the cases appearing in the note below.[4]

We are in accord with the decisions cited that we would create a deplorable situation in this island if we refused to the taxpayer citizen the right to apply to the courts in search of protection against the illegal use of public funds by public

[4] *Croach* v. *Bennett,* 17 S.E. 2d. (S. C.) 320; *Page* v. *King,* 131 Atl. 707; *Clark* v. *Crown Drug Co.,* 152 S.W. 2d. 145; *Conway* v. *Water Resources Board,* 179 Atl. 83; *Leckenby* v. *Post Printing & P. Co.,* 65 Colo. 443; *Gaston* v. *State Highway Dept.,* 132 S. E. 680; *Fischer* v. *Marsh,* 202 N. W. 422; *White Eagle Oil, etc., Co.* v. *Gunderson,* 205 N. W. 614, 43 A. L. R. 397; *Castillo* v. *State Highway Com.,* 279 S. W. 673; *Anderson* v. *Houtes,* 240 S. W. 647.

officers. The latter are the servants and not the masters of the taxpayers, and there is no legal reason why they should be considered beyond the reach of the powers of a court of equity, when in the exercise of such powers it is necessary to compel them to act within the limit of the law.

It may be said that if we recognize the right of the taxpayer to bring proceedings of this nature, we will open the door to a multiplicity of suits, as many taxpayers would appear maliciously before the courts in an attempt to paralize the functions of the Government. The objection is not a very convincing one. We must presume that the district courts, which are invested by our laws with the power to issue writs of injunction, will not issue them when frivolous cases and cases which have no merit are involved; that they will not act as mere instruments of machination tending to obstruct public officers in the performance of their duties; and that they will not only dismiss petitions that have no merit, but also punish those persons who in a frivolous manner invoke their aid by imposing on them the payment of costs and attorneys' fees.

That the averments contained in the petition for injunction filed in the court below present a meritorious *prima facie* case and that the questions raised, in so far as the alleged illegality of the acts against which the injunction is prayed for, are substantial and meritorious questions, has been shown by the praise-worthy attitude of the defendant officers, who, although they have raised the defense of lack of standing in the plaintiff, have insistently requested that this court consider and decide on the merits the legal and constitutional questions presented by the case.

We therefore hold that petitioner taxpayer has the necessary standing and interest to institute this injunction proceeding.

Second: Is Act No. 16 of November 27, 1942, as amended by Act No. 181 of May 15, 1943, an appropriation

act which is continuous and self-renewing in the sense that whenever the sum of $16,000,000 appropriated by § 14 to carry out the purposes of the Act is exhausted, another sum in the same amount becomes available? The question propounded must be answered in the negative.

Section 14 of the original Act—No. 16 of 1942—contains two entirely separate and distinct provisions. The first is a specific, fixed, certain and total appropriation, once only, of "the sum of ten million (10,000,000) dollars . . . out of any funds in the Treasury of Puerto Rico not otherwise appropriated" to be spent within an indeterminate period of time. The second created a fund, additional, eventual and indeterminate as to its amount and without limitation of time, of "the seventy (70) per cent of the revenues of the Insular Treasury from the proceeds of the Federal Internal Revenue Tax on distilled spirits shipped or which may be shipped from Puerto Rico to the United States from and after November first 1942."

The effect of the amendments to § 14 of Act 16 of 1942 by Act 181 of 1943, *supra,* was: (*a*) to eliminate entirely the special fund created with the 70 per cent of the Federal Internal Revenue Tax on distilled spirits; (*b*) to assign or appropriate the total sum of $16,000,000 to carry out the purposes of the Act; and (*c*) to provide that the total sum appropriated, or such part thereof as might be necessary in the opinion of the Insular Emergency Council, be spent in any fiscal year and until it is declared, in accordance with § 19 of the Act, that the state of emergency has terminated. The plain purpose of this last provision was to avoid that the appropriation be considered as a fiscal year appropriation, in which case the remaining funds would revert to the general-funds of the Treasury at the expiration of the fiscal year.

The construction that in our opinion must be given to § 14, as amended, that is, that the appropriation is one for

the total sum of sixteen million dollars, once only, and to be used totally or partially in any fiscal year, while the state of emergency exists, finds additional support in the following provisions of the same Sections:

". . . *Provided,* that of the total amount of this appropriation, the sum of four million (4,000,000) dollars shall not be available until July first 1943; . . .

". . . And *provided, also,* that of the appropriation of sixteen million (16,000,000) dollars made in this Act for the Emergency Program, not more than two million three hundred thousand (2,300,000) dollars, etc."

We have before us S. B. 28 and H. B. 130, offered in evidence in the court below. We have carefully examined those two bills, neither of which became a law, as they were not approved by both branches of the Legislature. The titles of both are identical: "An Act to appropriate from any funds available in the Insular Treasury not otherwise appropriated, *the additional sum* of $21,500,000 to be invested by the Insular Emergency Council, to carry out the provisions, etc."

In the statement of motives of S. B. 28 it is said:

"The Insular Emergency Council was created by Act No. 16, approved November 27, 1942, as amended by Act No. 181 of May 15, 1943, with the object of carrying out a relief program etc.

"To carry out such program the said Act, as amended, appropriated the sum of sixteen million (16,000,000) dollars per annum."

H. B. 130 contains no statement of motives. Section 1 "appropriates from any funds available in the Insular Treasury," $21,500,000, "which sum shall be placed at the disposal of the Insular Emergency Council to be invested, etc." Section 2 reads thus: "The sum herein appropriated is in addition to the sum appropriated by Act No. 16 of November 27, 1942, as subsequently amended." Section 2 of S. B. 28 is identical to § 2 of H. B. 130, just quoted.

We are asked to accept, as evidence of the legislative intent to appropriate sixteen million dollars per annum, the above-quoted second paragraph in the statement of motives of the Senate Bill. That proposition must be rejected. When a law is clear and free from all ambiguity, as is the Act we are examining, the intention or purpose which the legislature had in enacting the same can not be gathered from the statements contained in another law enacted at a subsequent session, and much less by what may be said in a bill which has not received the approval of both houses.

We do not find in the law in force, nor in the bills submitted to our consideration, anything revealing the intention of the legislator to grant to the executive officers who constitute the Insular Emergency Council an authorization to use every year, or every time the previous appropriation is exhausted, a new sum of $16,000,000.

Third: Was the sixteen-million-dollar appropriation for the emergency program automatically renewed, by virtue of the provisions of § 34 of the Organic Act, at the expiration of the fiscal year 1943–1944, on June 30, 1944, because the Legislative Assembly failed to make the necessary appropriations for the support of the Government?

In order to be able to answer the question we have asked, it would be desirable to state briefly the historical facts that gave rise to the approval by the National Congress, on July 15, 1909, of an act amending our old Organic Act (the Foraker Act), by virtue of which there was inserted at the end of § 31 of said Organic Act the following:

"*And provided further,* That if at the termination of any fiscal year the appropriations necessary for the support of government for the ensuing fiscal year shall not have been made an amount equal to the sums appropriated in the last appropriation bills for such purpose shall be deemed to be appropriated; and until the legislature shall act in such behalf the treasurer may, with the advice of the Governor, make the payments necessary for the purposes aforesaid."

In the year 1909, owing to disagreements between the House of Representatives and the Executive Council, the Legislature adjoined without having passed the budget bill making appropriations necessary for the support of the Government during the fiscal year beginning July 1, 1909, and ending June 30, 1910. To meet the crisis created in the Government owing to the lack of legislative authorization to use public funds with which to defray the necessary expenses for its support, the National Congress approved the amendment above quoted known by the name of its author, Congressman Olmsted.

The new Organic Act, known as the "Jones Act," approved March 2, 1917, contains at the end of the first paragraph of § 34 a provision almost identical to that of the Olmsted amendment, which reads as follows:

"If at the termination of any fiscal year the appropriations necessary for the support of the government for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation bills for the objects and purposes therein specified, so far as the same may be applicable, shall be deemed to be reappropriated item by item; and until the legislature shall act in such behalf the treasurer may, with the advice of the governor, make the payments necessary for the purposes aforesaid."

That what the author of the Olmsted amendment had in mind was the solution of the crisis created by the non-approval of the general budget—Appropriation Bill—for the year 1909–1910, is clearly gathered from his statement in the House in favor of the bill, said statement appearing in Volume 44 of the Congressional Record (May 27, 1909), page 2465:

". . . but no matter which side was right or wrong, no matter what revision ought to be made in this Foraker Act, the fact is that we are face to face with this situation: That the general session of the Porto Rican legislature having adjourned, and the extraordinary sessions having adjourned, and there being no provision

whatever for the payment of the necessary expenses of the insular government after June 30, 1909, it is up to Congress to do something.''

It is true that further on (C. R., p. 2466) the same Mr. Olmsted, in objecting to the suggestion that the amendment ought to be in force for only a year, expressed himself thus:

"It could be done, but I see no serious reason why it should be done. In the Hawaiian and Philippine acts we made that a permanent provision. If they want to change *the existing appropriations,* they will get together and do it.''

It is obvious that, in speaking of the ''existing appropriations,'' Mr. Olmsted was referring to the appropriations made in the appropriation bills for the support of the Government approved in previous years, which ought to be reappropriated in subsequent years.

Mr. Larrínaga, our Resident Commissioner at that time, interpreted the scope of the Olmsted amendment to mean what his words quoted from Volume 44, page 2520 of the Congressional Record, indicate:

"MR. LARRÍNAGA: I suggest, Mr. Chairman, that you do just as the President has advised—*that the budget of the previous year go on,* provided that the Foraker Act is taken up by the Committee on Insular Affairs and amended in a liberal sense. If the gentleman from New Jersey will accept my resolution, I will introduce one providing that the Foraker Act be revised at the next session of Congress, *and the budget of last year shall go on.''* (Italics ours.)

In the session of the House of June 7, 1909, Mr. Olmsted, in explaining the object of his bill, said:

"It is the object of the pending bill to remove that difficulty by providing that the appropriations upon which both houses of the insular legislature did agree *for the current fiscal year* shall be considered as reappropriated and used for the payment of the necessary expenses until such time as the legislature shall act in the matter of appropriations, whereupon this bill will, by its terms, cease to operate.'' (Italics ours.)

Let us consider now what is meant by "appropriation" and "appropriation bills."

The Federal Supreme Court, in the case of *Bengzon* v. *Secretary of Justice and Insular Auditor*, 299 U. S. 413, 81 L. ed. 312, has laid down in clear and precise terms the rule for determining when an act may be considered an appropriation bill. We shall sumarize the facts of said case.

The Legislature of the Phillippine Islands approved an act entitled "Act to authorize the payment of retirement pensions to officers and employees of the Insular Government who have retired from service as a result of the reorganization or reduction of its personnel, including justices of the peace, etc."

The Organic Act of the Phillippine Islands authorizes the Governor to "veto any item or items in any appropriation bill, but the veto shall not affect the item or items to which he has no objection." In the exercise of said power, the Governor vetoed § 7 of the Act which provided that justices of the peace who were to retire would also be entitled to the pensions granted by law. Bengzon, a retired justice of the peace, applied for a writ of mandamus in order that the payment of his pension be ordered, despite the fact that § 7 thereof was vetoed. The Supreme Court of the Philippines upheld the validity of the veto and denied the mandamus. Its judgment was reversed by the Federal Supreme Court, which said (p. 413):

"This exceptional power, it will be seen, is limited to appropriation bills; any other kind of legislation being controlled by the general rule. And its exercise is restricted to the disapproval of a particular item or particular items of such a bill. The precise question for consideration, therefore, is—did the bill which became Act 4051 constitute an appropriation bill; and, if so, was § 7, within the meaning of the foregoing provision of the Organic Act, an item of such bills?

"It first is to be observed that the title of the act in no wise suggests that what follows is an appropriation bill; and an examina-

tion of the act itself discloses that, with the exception of § 10, the bill itself proposed only general legislation. Eliminating § 10, the remaining eleven sections could stand as a generic act of legislation, leaving the specific matter of appropriation to be dealt with by later enactment. *The term 'appropriation act' obviously would not include an act of general legislation; and a bill proposing such an act is not converted into an appropriation bill simply because it has had engrafted upon it a section making an appropriation.* An appropriation bill is one the primary and specific aim of which is to make appropriations of money from the public treasury. To say otherwise would be to confuse an appropriation bill proposing sundry appropriations of money with a bill proposing sundry provisions of general law and carrying an appropriation as an incident.

"*    *    *    *    *    *    *

"If the Governor General had power under the foregoing clause of § 19 of the Organic Act to veto § 7 of the gratuities bill, he had like power to veto § 2, granting preferences to certain classes of officers and employees; or § 4, allowing a choice between the gratuity granted by the act under review and a gratuity granted by some other act; . . . All of them are distinct parts of an act of general legislation. The elimination of any by an exercise of the veto power, with the going into effect of the remaining portions of the bill as a consequence . . . would result in the enactment of a general law in an emasculated form not intended by the legislature and against the will, perhaps, of a majority of each house. This would not be negation of an item or items of appropriation by veto but, in effect, affirmative legislation by executive edict." (Italics ours.)

The rule just stated, applied to the situation we are considering, leads us necessarily to the conclusion that Act No. 16 of November 27, 1942, as amended by Act No. 181 of 1943, is not an appropriation bill within the meaning of § 34 of the Organic Act. That Act No. 16 of 1942, as amended, is legislation of a general character, is clearly gathered from its title and from the contents of its twenty-two Sections, with the exception of § 14, which is the one that contains the appropriation. Section 1, after stating the reasons existing for the approval of the act, declares the existence of a state of emergency and the urgent necessity of approving a pro-

gram to face it. Section 2 creates the Insular Emergency Council. Section 3 enumerates in detail, in ten separate paragraphs, the powers that the Council will have; and § 4 specifies its duties. Title I, which comprises §§ 5, 6, and 7, refers to the drawing and coordination of an emergency work program. The kinds of projects that may be included in the emergency work program are defined. Planting, collection, storage, preservation, and distribution of food products projects are authorized. The minimum term of work and the minimum salary to the workmen employed in the emergency projects are provided for. And the Council is authorized to regulate the management and supervision of the work. Title II, §§ 8, 9, 10, and 11, comprises everything necessary with regard to compensation to the unemployed, lowering of prices of foodstuffs and general economic relief. Title III (§ 12) authorizes the Council to establish cooperative organizations with the object of increasing maritime transportation facilities. Title IV (§ 15) grants the Council the power of eminent domain, to fix policies, and to determine the use to be made of the property condemned. Section 15 provides that all expenses and disbursements shall be made pursuant to the provisions of the Organic Act; § 16 provides the stipulations to be included in the arrangements, agreements, and contributions of funds made by the Insular Emergency Council in connection with projects of the W.P. A. or any other federal agencies; § 17 authorizes the Council to grant or allocate funds to the Government of the United States or to any federal, insular or municipal agency, to buy and distribute products of all kinds and to distribute money to indigent persons. The remaining Sections refer to the form and manner in which the state of emergency may be considered as having terminated and to other formal provisions appearing in all laws.

From the examination we have made it will be noted, without great effort, that Act No. 16 of 1942 is a complete piece

of general legislation, designed and prepared to meet an abnormal emergency situation. The appropriation made by § 14 is incidental to the fundamental purpose of the Act and does not have the legal effect of converting said Act into an appropriation bill or act.

We are of the opinion that the "appropriation bills" to which § 34 of the Organic Act refers, which are self-renewable when not approved by the Legislature before the beginning of the next fiscal year, are, besides the "general appropriation bill," all those properly called appropriation bills in which annual appropriations of funds are made for the necessary expenses for the support of the Government during the next fiscal year. We agree that the necessary funds for the emergency program, if they had been duly appropriated, must be considered as funds necessary for the support of the Government (*Steward Machine Co.* v. *Davis*, 301 U. S. 548), but we can not accept the proposition that the Act we are examining must be considered as an appropriation act within the meaning of § 34 of the Organic Act (*Bengzon* v. *Secretary of Justice, supra*).

The appropriation contained in Act No. 16 is not self-renewable under § 34 of the Organic Act by virtue of the fact that the Act has as its main objet the facing of an emergency. The Organic Act provides that public funds may not be used without authorization of the Legislature and contains no provision authorizing the executive branch of the Government to use them, without such authorization, in cases of emergency. The federal agency known as the W.P.A. was created to face a state of national emergency; and to carry out its purposes many millions of dollars of the funds of the Federal Treasury were appropriated by Congress. Whenever the funds were exhausted, Congress made new appropriations. When it failed to make them, the W.P.A. was compelled to cease its activities.

■ Petitioners herein have pleaded as an additional defense that the courts lack jurisdiction to render judgment against the Auditor of Puerto Rico, as he is an officer who, under the Organic Act, has exclusive authority to authorize the disbursement of funds, approve accounts, etc.

The Auditor has been sued in his capacity as Auditor and also in his capacity as a member of the Insular Emergency Council. The defense raised, besides being academic, is premature. The present case does not attempt to enjoin the Auditor from authorizing the disbursement of funds or from approving disbursement vouchers. If the injunction prayed for against the members of the Insular Emergency Council were issued, the Auditor of Puerto Rico would not have the opportunity nor the need of acting in his official capacity as such Auditor, inasmuch as there would be no disbursements nor accounts to be approved.

The crisis exists, but the difficulties in the way of its solution are not insuperable nor is a solution impossible. It is not a crisis created by forces beyond the control of the Legislature, which is the body called upon to act to solve the same, and not the courts.

During the fiscal year 1943–44 our Insular Treasury had revenues amounting to the total sum of $101,478,312.62, out of which amount $62,385,623.39 came from the Federal Excise Tax on alcoholic beverages. There are, thus, in our Insular Treasury funds more than sufficient to face the needs of the Emergency Program. We have a Legislature which can be convened in a special session. It is the only body which may constitutionally appropriate the necessary funds with which to face the crisis. The remedy is not in our hands.

The writ of certiorari will be annulled, as well as the order entered by this court under date of July 13, 1944, staying the effect of the restraining order decreed by the court below, said restraining order being restored in its full force

and effect, and the case is remanded to the District Court of San Juan for further proceedings not inconsistent with this opinion.

Opinion of MR. JUSTICE SNYDER, dissenting as to the standing of the taxpayer to file the suit herein, and concurring as to the merits of the case.

I dissent from the majority opinion of the court in this case because I regard *Massachusetts* v. *Mellon,* 262 U. S. 447, as directly in point and decisive of this case. The Supreme Court of the United States held in that case that a taxpayer has no standing to sue for an injunction to restrain the alleged illegal or unconstitutional expenditure of public funds by government officials. The fact that Federal rather than insular funds and officials were involved therein in no way affects the principle enunciated in that case. The unanimous opinion of the Supreme Court, written by Mr. Justice Sutherland, says at pp. 488-9:

"The functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts. The general rule is that neither department may invade the province of the other and neither may control, direct or restrain the action of the other. We are not now speaking of the merely ministerial duties of officials. *Gaines* v. *Thompson,* 7 Wall. 347. We have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act. Then the power exercised is that of ascertaining and declaring the law applicable to the controversy. . . . The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally. . . . Here the parties plaintiff have no such case. Looking through forms of words to the substance of their complaint, it is merely that officials of the execu-

tive department of the government are executing and will execute an act of Congress asserted to be unconstitutional; and this we are asked to prevent. To do so would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess.''

This court has cited with approval and has followed the doctrine laid down in *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, and *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, which go much further than *Massachusetts* v. *Mellon*[1] in denying access to the courts to those not specially and directly injured by virtue of the provisions of the statutes being assailed and the action being taken thereunder. *College of Pharmacists* v. *Insular Board of Pharmacy,* 60 P.R.R. 789; *Government of the Capital* v. *Executive Council of Puerto Rico, etc., et al.,* 63 P.R.R. 417, decided April 20, 1944. The opinion of the majority of the court in this case seems to me to be squarely in conflict with the principle laid down in *Massachusetts* v. *Mellon* and in our own cases.

The principle for which these cases stand has never been better stated than in the language of Judge Córdova of the District Court of San Juan in a case similar to the instant case in which Judge Córdova held that a taxpayer has no standing to file a suit such as that involved herein. In that case, which was never appealed to this court, Judge Córdova used the following language:

''This is not a question of technicalities. It involves something fundamental in the system of tripartite division of powers. There has been considerable discussion and opposition in connection with the power that the American courts have assumed to determine the constitutionality of legislative and executive acts. The justification of the attitude assumed by the courts is found in the necessity to consider the validity of these acts incidental to a determination of the rights and obligations of the parties in a justiciable controversy. The courts have not attempted, nor could they attempt,

---

[1] See Notes, 51 Harv. L. Rev. 897.

to act as supervisors of the executive and of the Legislature. They have no authority to act in a vacuum. The interest which the community or any citizen might have in legislative or executive acts is not sufficient basis on which to justify intervention of the judicial power. This does not mean that sanctions are lacking for those legislative or executive excesses which do not directly affect the rights of some citizen or group of citizens. Other sanctions, more effective than the judicial, exist in a democracy. And although we can not say that the Organic Act has provided Puerto Rico with a completely democratic government, it is obvious that there has been established here in principle the system of tripartite division of powers within which the judicial power lacks authority to interfere with the acts of the other branches of government unless the said acts directly injure the rights or interests of some litigant."[2]

I assume that the question of standing to sue herein is a local question, and that we are free to adopt our own rule, even to the extent of refusing to follow *Massachusetts* v. *Mellon*. But I agree with *Massachusetts* v. *Mellon*. And even if I did not, I should hesitate a long time before voting for a contrary rule, in view of the fact that the rule of *Massachusetts* v. *Mellon* is rooted in the basic constitutional concept of separation of powers. The Supreme Court of the United States has wisely left to us the decision of local questions. In discharging that great responsibility, I am reluctant to vote for a result contrary to a decision of the Supreme Court of the United States itself, particularly in a case challenging our power to act, in the absence of a statute, by virtue of the doctrine of separation of powers. That

[2] *Puerto Rico Ilustrado, Inc.*, v. *Buscaglia*, Civil No. 41175, Injunction, District Court of San Juan, Nov. 5, 1942. The Supreme Court of the United States has recently reiterated the same idea. It has said that the view that the plaintiff ''lack[s] standing to sue does not rest upon a mere formality. We rest it upon reasons deeply rooted in the constitutional divisions of authority in our system of Government and the impropriety of judicial interpretations of law at the instance of those who show no more than a mere possible injury to the public.'' (*Perkins* v. *Lukens Steel Co.*, 310 U.S. 113, at 132). As already noted, (p. 125) ''Respondents, to have standing in court, must show an injury or threat to a particular right of their own, as distinguished from the public's interest in the administration of the law.''

theory of government, after all, came here from continental United States. The Supreme Court of the United States, although not bound to do so, defers to this court on questions of civil law in cases coming to it from this jurisdiction. Should we not in turn defer to the Supreme Court of the United States on a question as basic to the American form of government as the separation of powers?

In addition, I feel we should, as a civil-law jurisdiction, be slow to read into our general statutes the power of the courts to restrain action of government officials in the absence of a specific statute empowering us to grant such an extraordinary remedy under such circumstances (see *People v. Escambrón Beach Club*, 63 P.R.R. 731, decided June 5, 1944). Even in common-law jurisdictions some states have refused to grant relief such as that prayed for herein until a state statute specifically provided therefor. The Supreme Court of the United States has said: "It is by now clear that neither damage nor loss of income in consequence of the action of Government, which is not an invasion of recognized legal rights, is in itself a source of legal rights *in the absence of constitutional legislation recognizing it as such.*" (Italics ours).[3] How can the opposite result be justified in a civil-law jurisdiction?

We must not loss sight of the fact that the jurisdiction of the courts of Puerto Rico depends upon enactments of the Insular Legislature (Title 48 U.S.C.A. § 861). It is our Legislature which grants—and withdraws—the jurisdiction of our courts to issue an injunction in this or any other type of case. And I can find no statute authorizing our courts to grant an injunction herein. That in itself should be sufficient for us to stay our hand.

I would therefore vacate the restraining order and remand the case to the district court with instructions to dismiss the suit for the above-stated reasons.

---

[3] *Perkins v. Lukens Steel, supra*, at p. 125.

If I were expressing the views of the majority, this opinion would end at this point. But I stand alone on this phase of the case. My colleagues have outvoted me and have ruled that it is the duty of the court to pass on the questions of substantive law involved herein. On the merits of the case, I find myself in complete agreement with the opinion of the court and join therein.